**CARE TRAVEL COMPANY, LTD., Plaintiff–Appellee,**

v.

**PAN AMERICAN WORLD AIRWAYS, INC., Defendant–Appellant.**

**No. 1355, Docket 91–7035.**

United States Court of Appeals, Second Circuit.

Argued April 11, 1991.

Decided Sept. 5, 1991.

Malcolm A. Hoffman, New York City, for plaintiff-appellee.

Rita Murphy–Johnson, New York City (Pan American World Airways Legal Department, of counsel), for defendant-appellant.

Before CARDAMONE and MAHONEY, Circuit Judges, and MARTIN, District Judge.*

MARTIN, District Judge:

Appellant Pan American World Airways, Inc. ("Pan Am") appeals from a judgment against it entered December 11, 1990 in the Southern District of New York, Thomas P. Griesa, District Judge, following a two-week jury trial.

Appellee Care Travel Company, Ltd. ("Care Travel") commenced this diversity action on March 24, 1989, alleging that Pan Am breached the parties' agency agreement which appointed appellee a Pan Am General Sales Agent and which allegedly granted appellee the exclusive right to sell Pan Am tickets from England to Karachi, Pakistan and Bombay, India. The jury found that appellant, by permitting another travel agency to sell tickets from England to Karachi and Bombay, breached the parties' written agency agreement. The jury further found that appellant made and breached promises after April 26, 1985 to remedy its alleged breach of the agreement. The jury awarded appellee $586,868 in damages.

On appeal, Pan Am argues that (1) the district court erred by admitting parol evidence that the jury utilized in interpreting the agreement; (2) Care Travel's continued performance after the alleged breach of the written agreement constituted an acceptance of a new agreement; (3) Care Travel, as a matter of law, is not entitled to recover for a breach of a promise to cure a prior breach; (4) it was denied a fair trial when the district judge introduced an erroneous theory not advanced by plaintiff; (5) and the issue of damages was not properly presented to the jury.

## BACKGROUND

In 1984, Pan Am, due to its limited connections in the Indian and Pakistani communities of the United Kingdom, was interested in appointing a General Sales Agent ("GSA") to market and sell airline tickets in these communities for flights to the Indian subcontinent. As a result, Peter Moss of Pan Am contacted Mr. Babu Patel and Mr. Jagdish Patel who, along with Mr. Rajinder Dugal, owned and operated Rajan Travels. The principals of Rajan Travels expressed an interest in the idea and a series of meetings followed in the spring, summer and fall of 1984.

At that time, Empire Travel was already acting as a Pan Am GSA in the United Kingdom selling tickets to the Indian subcontinent. Empire Travel operated out of Southall, Middlesex, an area west of London. Nevertheless, Care Travel claimed that during the negotiations that ensued between it and Pan Am, the appellant made it known that it wanted a single company to act as its GSA in the United Kingdom. The principals of Rajan Travels thus activated a dormant company, Care Travel, for this purpose.

In July of 1984, after months of negotiations, Pan Am delivered to Care Travel its standard General Sales Agency Agreement (the "Agency Agreement") for the latter's review. The Agency Agreement provided that Care Travel was appointed to act as Pan Am's GSA within the General Sales Territory described in Annex A to the Agency Agreement. Annex A listed Care Travel's GSA territory as "London W1," an area within London. Although the standard GSA agreement provided that Care Travel would sell tickets to all of India and Pakistan, a subsequent writing memorialized the parties' agreement that Care Travel could only sell tickets to Karachi and Bombay.

The specification of a separate territory out of which both Care Travel (London W1) and Empire Travel (Southall, Middlesex) allegedly could operate was consistent with the regulations and resolutions of the International Association of Travel Agents ("IATA"), which governs relations between airlines and travel agents and which were incorporated into the Agency Agreement.

---

* The Honorable John S. Martin, Jr., District Judge of the District Court for the Southern District of New York, sitting by designation.

Specifically, paragraph 10 of IATA Resolution 876 provides that:

(a) when a GSA is appointed, the territory in which it may exercise the authority delegated by the appointing Member shall be clearly defined in the agreement between the parties concerned and shall in no case be smaller than a political unit (i.e., country, state, province, county, town or village, or the equivalents or combination thereof) with a population at the time of appointment of not less than 10,000; any existing or subsequently established branch offices of the GSA within the defined territory shall be subject to all of the terms and conditions of the existing General Sales Agency Agreement;

(b) in any one territory no member shall appoint more than one GSA.

Also expressly incorporated into the parties' Agreement was a "Pan American World Airways General Sales Agency Questionnaire" (the "Questionnaire"), which Rajan Travels, on behalf of the soon-to-be activated Care Travel, was required to complete and return to appellant as part of the GSA application process. In the Questionnaire, Care Travel was asked the following questions:

What percentage of the territory's production do you expect to be directly sold by your office? How is it composed in terms of commercial account, pleasure, government or military travel? What plans do you have to solicit each of these traffic sources:

Care Travel provided a single response: "All sales are through our own offices and about 250 sub-Agents at our disposal." The Questionnaire was returned to Pan Am in August of 1984.

Care Travel was due to commence business operations as a Pan Am GSA on October 1, 1984. Since Pan Am had, at that time, still not signed the Agreement, Ramon G. Evans, Pan Am's Sales Manager for the United Kingdom and Northern Eu-rope, by letter dated September 25, 1984, wrote Jagdish Patel and confirmed various points upon which the parties had agreed. Included among the matters discussed is the statement by Pan Am that Empire Travel would be notified that, commencing October 1, 1984, it would only be permitted to sell tickets to Delhi. Further, Empire Travel would be informed that, apart from a short overlap period during which it would be allowed to honor tickets it had sold before October 1, 1984, Empire Travel would no longer be authorized to sell tickets to Bombay and Karachi.

In the next few weeks, Pan Am forwarded to Care Travel a letter providing the fare levels for tickets from England to Bombay and Karachi and, finally, the signed Agency Agreement.[1] At the same time, Care Travel commenced its operations in an office in London that was designed to appear as a Pan Am office.

Not long after the overlap period discussed in the September 25, 1984 letter had ended, Pan Am workers went on strike. As a result, the airline did not operate flights to India and Pakistan during February and March of 1985. After the strike ended, Pan Am, in an "urgent need" to recoup losses caused by the strike, sent out a letter dated April 26, 1985 (the "Letter") to Care Travel and Empire Travel notifying each that henceforth, both Empire Travel and Care Travel would be permitted to sell tickets to Karachi, Bombay and Delhi.

Care Travel immediately objected in writing to this new policy as contrary to the understanding upon which it had agreed to become Pan Am's GSA. According to appellee, Pan Am responded by stating that the new arrangement was necessary for a short period of time in order to allow Pan Am to recoup its losses caused by the strike. In addition, Rajinder Dugal, plaintiff's majority shareholder testified at trial that Pan Am promised to terminate Empire Travel if Care Travel would, for a short period of time, continue to sell tickets in competition with Empire Travel.

---

1. The signed Agency Agreement was accompanied by a cover letter, previously noted, which confirmed that the parties had agreed that Care Travel would be permitted to sell tickets to Karachi and Bombay.

Mr. Dugal testified at trial that the next two and one-half-year period—from April of 1985 until Care Travel's termination in October of 1987—was marked by Care Travel's repeated complaints to Pan Am that the non-exclusive GSA arrangement was resulting in a price war between GSAs that was costing Care Travel substantial revenue. Mr. Dugal further testified that, in response to such complaints, Pan Am repeatedly assured Care Travel that the termination of Empire Travel was forthcoming.[2] Pan Am, however, continued to do business with Empire Travel, even after that GSA filed for and emerged from bankruptcy.

Care Travel claimed that it was disappointed by this turn of events but continued throughout 1986 and 1987 to sell tickets at a loss in reliance upon Pan Am's promises to remedy its alleged breach. In 1987, an affiliated company of Empire Travel, Sun and Sand Travel, also went into bankruptcy. Thereafter, Pan Am again notified Care Travel that it was terminating Empire Travel and, indeed, in the late summer of 1987, Empire Travel was terminated.

Pan Am, however, soon after reversed course and, by letter dated October 30, 1987, provided appellee with a 90–day notice of termination. A newly formed company, Hindustan Travels, run by the Kumar family, which owned Empire Travel, was given the exclusive right to sell Pan Am tickets in the United Kingdom for routes from London to the Indian subcontinent.

At the conclusion of the trial, the trial judge submitted to the jury a series of special interrogatories that asked the jury (1) whether Pan Am appointed Care Travel to be its GSA in the United Kingdom for flights to Bombay and Karachi; (2) whether Pan Am breached this agreement; (3) whether Pan Am made a promise or series of promises to remedy its earlier breach; (4) whether Pan Am breached the subsequent promise or promises; and (5) what damages Care Travel suffered as a result. The jury answered the first four questions in the affirmative and awarded Care Travel $586,868 in damages. Judgment was entered on December 11, 1990. Pan Am subsequently moved for and Judge Griesa denied a motion for judgment notwithstanding the verdict. This appeal followed.

## DISCUSSION

We first address Pan Am's parol evidence contention. Pan Am argues that the Agency Agreement clearly and unambiguously limited Care Travel's territory to "London W1." Thus, appellant contends that the district court erred in determining that the Agency Agreement was ambiguous and, as result, permitting the jury to consider parol evidence in interpreting the scope of Care Travel's agency.[3]

"In a contract action, the court's general objective should be to give effect to the [expressed] intentions of the parties in entering into the agreements." *Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir.1990); *see also Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir.1989); *Hartford Acci. & Indemnity Co. v. Wesolowski*, 33 N.Y.2d 169, 171–72, 350 N.Y.S.2d 895, 898, 305 N.E.2d 907, 910 (1973).

■ Under New York law, which governs the Agreement at issue here, if a contract is unambiguous on its face, the parties' rights under such a contract should

---

**2.** While appellant points to two letters written by Care Travel to it as indicating that Care Travel, in fact, was satisfied with its relationship with Pan Am, Care Travel, on the other hand, contends that it wrote the letters at the suggestion of Pan Am in order to provide Pan Am with the documentation needed to terminate Empire Travel.

**3.** Pan Am, thus, contends that its GSAs were granted the exclusive right to sell tickets in their designated territories to any destination on the Indian subcontinent. In other words, both Care Travel, within W1, and Empire Travel, within Southall, could sell tickets to Bombay, Karachi and Delhi. Interpreting the Agency Agreement in this manner, Pan Am argues that its April 26, 1985 Letter permitting both Empire Travel and Care Travel to sell tickets to Karachi, Bombay and Delhi could not constitute a breach of the Agency Agreement. The jury, however, disagreed.

988

be determined solely by the terms expressed in the instrument itself "rather than from extrinsic evidence as to terms that were not expressed or judicial views as to what terms might be preferable." *Metropolitan Life Ins. Co., supra,* 906 F.2d at 889; *see also W.W.W. Assoc., Inc. v. Giancontieri,* 77 N.Y.2d 157, 565 N.Y.S.2d 440, 443, 566 N.E.2d 639, 642 (1990); *Teitelbaum Holdings, Ltd. v. Gold,* 48 N.Y.2d 51, 56, 421 N.Y.S.2d 556, 559, 396 N.E.2d 1029, 1031 (1979). On the other hand, parol evidence may be admitted to explain a writing when its terms are ambiguous. *Investors Ins. Co. of America v. Dorinco Reinsurance Co.,* 917 F.2d 100, 104 (2d Cir. 1990); *Health–Chem Corp. v. Baker,* 737 F.Supp. 770, 773 (S.D.N.Y.), *aff'd,* 915 F.2d 805 (2d Cir.1990).

■ Contract language is unambiguous when it has " 'a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.' " *Hunt Ltd., supra,* 889 F.2d at 1277 (quoting *Breed v. Insurance Co. of North America,* 46 N.Y.2d 351, 355, 413 N.Y.S.2d 352, 355, 385 N.E.2d 1280, 1282 (1978)). Conversely, a term is ambiguous when it is " 'capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.' " *Walk–In Medical Centers, Inc. v. Breuer Capital Corp.,* 818 F.2d 260, 263 (2d Cir.1987) (quoting *Eskimo Pie Corp. v. Whitelawn Dairies, Inc.,* 284 F.Supp. 987, 994 (S.D.N.Y.1968)). The determination as to whether the contract language is readily susceptible to one or more interpretations is made by the court with reference to the contract alone. *Burger King Corp. v. Horn & Hardart Co.,* 893 F.2d 525, 527 (2d Cir.1990); *W.W.W. Assoc., supra,* 565 N.Y.S.2d at 443, 566 N.E.2d at 642.

■ Since we believe that the entire integrated Agency Agreement is reasonably susceptible to more than one interpretation as to the scope of appellee's agency status, we find that the district court properly applied the above-discussed principles when it permitted the jury to consider extrinsic evidence to interpret the Agency Agreement.

The appellant argues that no ambiguity exists since the Agency Agreement clearly provides that appellee was appointed to act as Pan Am's GSA solely within the London W1 general sales territory. The IATA regulations, which appellant concedes are incorporated into the Agency Agreement, however require that GSA's defined territory "in no case be smaller than a political unit (i.e., country, state, province, county, town or village, or the equivalents or combination thereof)...." It seems clear that London W1 was not, as required, a "political unit (i.e., country, state, province, county, town or village, or the equivalents or combination thereof)." Therefore, its inclusion as the territory covered by the parties' Agency Agreement raises ambiguities which required resort to extrinsic evidence. In other words, the very term upon which appellant relies to establish the clarity of the Agency Agreement was itself ambiguous.

Moreover, the form contract provided by Pan Am to appellee states that the GSA's office address is indicated in Annex B. No office address is listed in Annex B. However, Annex A, the location where the London W1 territory is listed, is entitled "General Sales Agency Office Addresses." Thus, it is unclear whether the London W1 referred to in Annex A was merely the address of Care Travel's office or whether it was the territory from which appellee was required to operate. The admission of evidence outside the four corners of the document was, thus, necessary to ascertain the significance of the London W1 term.

In addition, the Agency Agreement required Care Travel to maintain agents within its general sales territory. In the Pan Am Questionnaire completed by appellee, which was made part of the Agency Agreement, Care Travel refers to its general sales territory as the place where its network of 250 subagents are located.

This response appears to conflict with the provision in the Agreement limiting Care Travel's territory to London W1 and, thus, at the very least results in a further ambiguity necessitating the admission of parol evidence as a means of clarifying the parties' intent.

Appellant also argues that the lack of any provision in the Agency Agreement restricting the destinations to which Care Travel could sell tickets undercuts appellee's argument that extrinsic evidence was properly admitted to establish that Care Travel was appointed Pan Am's exclusive GSA throughout the United Kingdom for the purpose of servicing the Karachi and Bombay markets. However, in the cover letter to Care Travel enclosing the Agency Agreement signed by Pan Am, appellant confirmed the parties' agreement that appellee was appointed to service the gateways of Karachi and Bombay. This letter modified the parties' Agency Agreement since the Agency Agreement provided that Care Travel would sell to destinations in India and Pakistan and did not specify any cities within these countries. As a result, Pan Am's Sales Manager, Ramon Evans, required Care Travel to signify its agreement to this change by signing the letter and returning a copy to Pan Am. This letter, which was expressly incorporated into the parties' Agency Agreement, creates a further ambiguity that renders it impossible to glean from the instrument itself the plain intent of the parties.

Given the ambiguities discussed above, we conclude that resort to evidence outside the four corners of the Agency Agreement was necessary in order to determine whether Care Travel's agency was limited to a geographical location—London W1—from which it could sell tickets or by specific markets to which it could sell Pan Am tickets. Accordingly, we find that the district court properly admitted the parol evidence regarding the parties' intent.

■ Pan Am's next two grounds for appeal are related and, thus, will be discussed in tandem. Appellant argues that Care Travel's continued performance after the alleged April 26, 1985 breach of the Agency Agreement constituted an acceptance of a new agreement; one in which Care Travel was no longer the exclusive Pan Am GSA for the Karachi and Bombay markets. Further, Pan Am contends that the judgment must be reversed because, as a matter of law, Care Travel is not entitled to recover for Pan Am's breach of its alleged promise or promises to cure its prior breach.

In order to make these arguments, Pan Am assumes, *arguendo*, that its April 26, 1985 letter permitting both Care Travel and Empire Travel to sell tickets to Bombay, Karachi and Delhi constituted a unilateral modification of and, thus, a termination of the parties' Agency Agreement. From there, Pan Am argues that since the parties' contract was terminable at will upon ninety days' written notice, appellee was entitled to at most only the damages suffered in this ninety day post-termination period.

Appellant further argues that, since Care Travel continued to perform under the post-April 26, 1985 arrangement, the original Agency Agreement was modified and, therefore, Care Travel waived its rights to insist on application of the parties' initial contract. Accordingly, appellant argues that Care Travel is not entitled to recover any damages under the old contract, including any damages sustained during the ninety-day notice period.

In effect, Pan Am's argument is premised upon the following assumptions: that the parties' initial contract was terminable at will upon ninety-days' notice, that the contract was unilaterally modified and, thus, terminated, by Pan Am in its April 26, 1985 letter, that this termination left the parties free to form a new contract with terms that differed from those contained in the initial contract and, finally, that Care Travel's continued performance following the termination of the initial contract constituted an assent to the modification of the Agency Agreement on those terms proposed by appellant.

Pan Am cites a number of cases which purportedly support the legal argument that if a party, notwithstanding its objec-

tion, continues to perform under a new or changed contract, the party has accepted the modified contract and, thus, has no damage remedy arising from the modification since it has waived its right to insist on the application of the parties' initial contract. *Flint v. Youngstown Sheet & Tube Co.*, 143 F.2d 923 (2d Cir.1944); *Curtiss Candy Co. v. Silberman*, 45 F.2d 451 (6th Cir.1930); *Waldman v. Englishtown Sportswear, Ltd.*, 92 A.D.2d 833, 460 N.Y.S.2d 552 (1st Dep't 1983); *Omega Precision Hand Tools, Inc. v. H. Alpers & Associates, Inc.*, 49 A.D.2d 885, 373 N.Y.S.2d 215 (2d Dep't 1975); *Horowitz v. La France Industries, Inc.*, 274 A.D. 46, 79 N.Y.S.2d 794 (1st Dep't 1948).

The fact patterns found in these cases, however, are distinguishable from that found in the instant action in several important respects. Specifically, in each cited case, one party unilaterally attempted to terminate an at-will contract by insisting upon a modification of its terms. The other party then indicated its assent to the new contract by continuing to perform. Accordingly, the courts found that the assent to the modification on the terms proposed by the breaching party precluded any recovery based upon the initial agreement.

Here, however, as the District Court noted, the contract between the parties provided that "[f]ailure to exercise or delay in the exercising of any right under this Agreement shall not waive or otherwise prevent the enforcement or exercise of such right or any other right."

Further, the jury was presented with evidence that Care Travel objected to the terms proposed by Pan Am in the Letter and that, in response to Care Travel's objections, Pan Am repeatedly promised to restore Care Travel's position to that of exclusive GSA. Moreover, evidence was presented that Care Travel continued to perform only in reliance upon these promises. Thus, Care Travel did not waive the right to recover damages for Pan Am's breach because of its agreement; rather, Care Travel agreed to continue to perform as Pan Am's agent on a non-exclusive basis

in return for Pan Am's promise to award it an exclusive right in the future. Thus, the cases cited by appellant are inapposite.

In effect, the jury was presented with evidence that the parties' relationship was modified by the Letter. The parties differed, not surprisingly, as to the terms of that modification. Appellant, on the one hand, contended that the modification was based upon its April 26, 1985 letter which permitted both Care Travel and Empire Travel to sell Pan Am tickets to Karachi, Bombay and Delhi. Care Travel, on the other hand, contended that its assent to sell tickets on a nonexclusive basis was temporary and conditioned on a restoration of it as Pan Am's exclusive GSA for Karachi and Bombay.

Given this issue of fact, the issue of the terms of the Agency Agreement's modification was properly submitted to the jury. In doing so, the trial judge did not frame the issue in terms of a modification of the initial Agreement. Instead, the trial judge asked the jury whether Pan Am acknowledged its April 26, 1985 breach of the Agency Agreement by promising to remedy the breach by restoring Care Travel to its position as exclusive GSA. Further, the judge instructed the jury to determine whether Care Travel performed thereafter in reliance upon, and whether Pan Am in fact breached, this alleged subsequent promise or series of promises.

■ Pan Am objects to this theory of recovery, arguing that a promise to comply with a pre-existing legal duty is not adequate consideration upon which a valid contract may be based. *See Goncalves v. Regent Intl. Hotels, Ltd.*, 58 N.Y.2d 206, 220, 460 N.Y.S.2d 750, 757–58, 447 N.E.2d 693, 699–701 (1983); *Fafoutis v. Lyons*, 149 A.D.2d 565, 566, 540 N.Y.S.2d 20, 21 (2d Dep't 1989).

In the present case, however, the parties did not simply covenant to perform their preexisting obligations. Rather, both parties did, or promised to do, something in addition to their pre-existing duties. Specifically, the parties' initial Agreement permitted Pan Am to terminate Care Travel on 90 days' notice. Evidence was presented

that, rather than exercise its right to do so, Pan Am instead promised to terminate Care Travel's competitor, Empire Travel, in the future. In return, Care Travel temporarily agreed to operate as a non-exclusive GSA under an arrangement which, appellee argued, caused it to suffer significant economic loss. As a result of this bargained-for exchange of promises, both parties suffered detriments and bestowed benefits on the other that differed from those placed on the parties in the Agency Agreement. These differing benefits and burdens supplied the consideration necessary to support the modification. As one commentator has explained:

> ... if the bargained-for performance rendered by the promisee includes something that is not within the requirements of the pre-existing duty, the law of consideration is satisfied. It makes no difference that the agreed consideration consists almost wholly of a performance that is already required and that this performance is the main object of the promisor's desire. It is enough that some small additional performance is bargained for and given.

1A Corbin on Contracts § 192 at 180 (1963). *See, e.g., Hoffa v. Fitzsimmons*, 673 F.2d 1345, 1359–60 (D.C.Cir.1982).

Here, Pan Am, in effect, promised Care Travel that it would not terminate their contract within 90 days, as it had an immediate right to do, but agreed to extend the length of the contract to a period of at least 90 days after the end of a reasonable period of time during which both Care Travel and Empire Travel would be operating as non-exclusive agents. Since this was different from Pan Am's pre-existing duty, we find the pre-existing duty rule inapplicable to the present situation.

In any event, if there was no new consideration, Pan Am's original agreement to use Care Travel as its exclusive agent for Bombay and Karachi remained in effect. Since Pan Am did not exercise its right to terminate Care Travel by giving 90 days notice, it remains liable for the damages suffered by Care Travel as a result of Pan Am's breach of its obligation of exclusivity.

As a further ground for appeal, Pan Am argues that the district judge overstepped his bounds of discretion and committed reversible error when, on his own initiative, he introduced into the case the theory that Pan Am's liability could be based upon its breach of a series of promises to cure the original breach of contract. Pan Am contends that this theory of recovery had never been advanced by the parties.

Pan Am further argues that, in presenting this theory, the district judge improperly conveyed his personal views about the merits of the parties' claims and their witnesses' credibility. Specifically, Pan Am contends that the district judge conveyed to the jury his opinion that the testimony of plaintiff's witness, Rajinder Dugal, was worthy of belief while that of defendant's witness, Ramon Evans, was not. In effect, Pan Am argues that the district judge assumed the role of an advocate and, in doing so, deprived it of a fair trial.

As this Court has previously explained, a federal district judge "is charged to see that the law is properly administered, and it is a duty which he cannot discharge by remaining inert." *United States v. Marzano*, 149 F.2d 923, 925 (2d Cir.1945) (Learned Hand, J.). Rather than "simply act[ing] as moderator," *Ah Lou Koa v. American Export Isbrandtsen Lines, Inc.*, 513 F.2d 261, 263 (2d Cir.1975), "or mere passive spectator," *Pariser v. New York*, 146 F.2d 431, 433 (2d Cir.1945), a federal district judge who conducts a jury trial "has the duty to see that the facts are clearly presented...." *Id.* at 433. In order to do so, the judge is permitted to summarize the evidence for the jury and, if he chooses, to comment on it. *American Export Isbrandtsen, supra*, 513 F.2d at 263. In addition, a judge may also "interpose relevant questions to witnesses 'to clarify both legal and factual issues and thus minimize possible confusion in the jurors' minds.'" *Dixon v. Maritime Overseas Corp.*, 490 F.Supp. 1191, 1196 (S.D.N.Y.1980) (quoting *Anderson v. Great Lakes Dredge & Dock Co.*, 509 F.2d 1119, 1131 (2d Cir.1979)). *See also Pariser, supra*, 146 F.2d at 433; Fed.R.Evid. 614(b)

("[t]he court may interrogate witnesses, whether called by itself or by a party").

■ There are, however, recognized limitations on the judge's right to actively participate in the trial. Specifically, a judge may not impose his own opinions on the jury and must avoid at all costs assuming the role of an advocate by making arguments to the jury. *American Export Isbrandtsen, supra,* 513 F.2d at 263; *United States v. Tourine,* 428 F.2d 865, 869 (2d Cir.1970), *cert. denied,* 400 U.S. 1020, 91 S.Ct. 581, 27 L.Ed.2d 631 (1971), *reh. denied,* 401 U.S. 966, 91 S.Ct. 968, 28 L.Ed.2d 249 (1971); *United States v. Marzano, supra,* 149 F.2d at 926. Finally, a trial judge is not permitted to add to the facts or "present his own theories when they are not strongly grounded in the evidence." *American Export Isbrandtsen, supra,* 513 F.2d at 263.

■ Read against the backdrop of these prohibitions, we find no merit to Pan Am's contentions. To begin with, Pan Am's argument that the district judge, on his own initiative, introduced a new theory of liability into the case is premised upon a series of questions the district judge asked plaintiff's main witness, Rajinder Dugal. These questions related to alleged conversations between Dugal and Pan Am's witness, Evans, regarding promises Evans allegedly made to remedy Pan Am's breach of contract by restoring Care Travel as Pan Am's exclusive GSA for the Karachi and Bombay destinations. Pan Am contends that this series of questions provided the framework for a new theory; one never previously advanced by Care Travel.

A review of the record, however, indicates that the identical line of questioning had been initially introduced by Care Travel at the outset of its case in Dugal's direct testimony. Indeed, Dugal's testimony on direct examination and in response to the district judge's questions establishes that Care Travel maintained from the commencement of the trial that it continued to act as Pan Am's GSA on a non-exclusive basis in reliance on Pan Am's repeated promises to restore the relationship to an exclusive one. Thus, the theory of recovery of which Pan Am now complains, while perhaps not articulated with precision by Care Travel, was "strongly grounded in the evidence." As a result, we find that, rather than introducing a new theory, the testimony elicited by the district judge was well within the Court's duty to clarify and fully develop the relevant facts for the jury's elucidation, and to assist the jury in giving meaning to such facts by organizing them in a coherent manner.

Pan Am also complains about the manner in which this allegedly new theory was presented to the jury. However, we do not believe that the district judge's mode of questioning Dugal indicated to the jury a bias on the court's part in favor of Care Travel or indicated that the judge had an opinion regarding the significance of the alleged new theory or of the credibility of the witnesses. Indeed, the sole excerpt to which Pan Am refers in support of the district judge's alleged bias evidences that the judge made clear that he supported neither parties' presentation:

> But the way I think it shapes up is this. The issue is presented by Mr. Dugal's testimony, and whether you accept his testimony or not that's up to you and I don't know whether you will or you won't, but let me put it this way, his testimony presents the following issue.

> Did Pan American acknowledge the breach of contract and make an agreement to remedy that breach, or a series of agreements to remedy the breach? Because if you accept—again I don't know whether you will or you won't—but if you accept Mr. Dugal's testimony that basically is the significance of it. Or you could conclude that that's the significance of it. That would be up to you. At least that's the issue: Did Pan American make an agreement or a series of agreements to remedy the breach?

> Well, that obviously is a different promise than that contained in the original agreement so there is a separate issue about that.

> And did Care Travel keep on acting in its capacity as the general sales agent in

reliance upon that promise or series of promises.

Moreover, the district judge coupled this instruction with a cautionary warning that the court's statements were not evidence and that the jury—and not the court was to make the ultimate assessment of the facts.[4]

In short, having carefully reviewed the record, we find no evidence that the district judge became an advocate for any party or introduced a theory into the case not grounded in the evidence. Nor do we find any evidence that Pan Am was prejudiced by the questions and comments the court did make. Accordingly, we find Pan Am's contentions in this regard to be without merit.

The final errors asserted by Pan Am refer to the question of damages. Appellant first contends that Care Travel failed to meet the stricter standard of proof of damages required of a new business under the test articulated by New York's Court of Appeals in *Kenford Co. v. County of Erie*, 67 N.Y.2d 257, 261, 502 N.Y.S.2d 131, 132, 493 N.E.2d 234, 235 (1986). Pan Am contends that without the requisite stricter proof, Care Travel's claim for damages was based on nothing more than pure speculation and, thus, the issue of damages should not have been submitted to the jury.

Pan Am's argument and, thus, its reliance on *Kenford*, rests on the assumption that Care Travel was a new venture. As testimony from Pan Am's own witness, John Varley, demonstrates, this assumption is misplaced. Mr. Varley, a high-ranking Pan Am official who had been em-ployed by appellant since 1959, testified that Pan Am was interested in having Care Travel act as its GSA in the United Kingdom due to the track record of Care Travel's principals:

> ... they appeared to have the general expertise to represent Pan American in the United Kingdom, to sell air transportation between London Heathrow, where we operated from, to Bombay, India and Karachi, Pakistan.
> They had the expertise. They had the subagency network within the United Kingdom, they had particular affiliation to the ethnic and religious groups that lived both in that particular area of India and certainly Bombay and Pakistan. They had affiliations with the United Kingdom for those same groups of people and subject to a financial evaluation and credit rating from a credit agency they were seriously being considered as a future appointee to handle Pan Am sales.

Other Pan Am witnesses, including Evans and John McGhee, Pan Am's regional director of marketing for northern Europe, confirmed that Care Travel was selected to act as appellant's GSA due to their prior experience and the existing network of subagents they brought with them.[5] In such a case, the stricter "new business" standard is inapposite to the facts of this case. *Cf. Hirschfeld v. IC Secur., Inc.*, 132 A.D.2d 332, 337, 521 N.Y.S.2d 436, 440 (1st Dep't 1987) ("While plaintiffs seek to cast this agreement as a new business venture, defendants ... have been in the syndication

---

**4.** Specifically, at the outset of his charge, the district judge instructed the jury that:
I have asked more questions in this case than I would normally ask in a case to be tried by a jury, but as the case unfolded it seemed to me that there was some rather difficult issues and I felt that sometimes things were not entirely clear to me and I felt they might not be entirely clear to you, and the purpose of a trial is to make the facts clear to the jury, make the issues clear and then how the jury decides those issues on the basis of the facts is up to the jury.
Nothing I have said has been intended to indicate to you how you should resolve the issues before you. It has always been intended—what I have done in the case, has been intended to draw out the facts, help to illustrate the issues in a more clear and precise way so that you can decide the answers to the ultimate questions.

**5.** Indeed, in his opening to the jury, Pan Am's counsel stated that "Care Travel consists of three directors, all of whom have been in the travel agency business for well over 20 years, and in fact they boasted that they created the concept of an ethnic GSA and they said they would be your GSA." Although not evidence, this statement is further indication that Pan Am itself did not consider Care Travel a "new business" in the same sense as the term was discussed in *Kenford, supra*.

business for an extended period of time and the transaction herein is of the same type as the many others they have successfully completed"), *app. dismd. without op.*, 72 N.Y.2d 841, 530 N.Y.S.2d 556, 526 N.E.2d 47 (1988); *S. Jon Kreedman & Co. v. Meyers Brothers Parking–Western Corporation*, 58 Cal.App.3d 173, 130 Cal.Rptr. 41 (Cal.App.Ct.1976) ("although this particular parking garage was new, the parking business is … not a new business and [defendant] was a highly experienced garage operator").

■ We further find that appellee presented sufficient evidence of its damages to allow the issue to go the jury. Under New York law, as articulated by the Court of Appeals in *Kenford*, lost profits may be recovered if it is "[f]irst … demonstrated with certainty that such damages have been caused by the breach." *Kenford, supra*, 67 N.Y.2d at 261, 502 N.Y.S.2d at 132, 493 N.E.2d at 235. Second, the damages must be capable of proof with reasonable certainty. *Id.* In other words, "the damages may not be merely speculative, possible or imaginary, but must be reasonably certain and directly traceable to the breach, not remote or the result of other intervening causes." *Id., citing Wakeman v. Wheeler & Wilson Manuf'g Co.*, 101 N.Y. 205, 4 N.E. 264 (1886). Finally, "there must be a showing that the particular damages were fairly within the contemplation of the parties to the contract at the time it was made." *Id., citing Witherbee v. Meyer*, 155 N.Y. 446, 50 N.E. 58 (1898).[6]

■ Applying these rules to the present case, we find that Pan American's "asser-

tion that the proof of any lost profits was purely speculative … is belied by the evidence." *S & K Sales Co. v. Nike, Inc.*, 816 F.2d 843, 852 (2d Cir.1987) (citation omitted). Specifically, Care Travel, relying in part upon appellant's own reports, presented evidence as to the actual sales made by both Care Travel and Empire Travel during the April 1985–January 1988 period for the Bombay, Karachi and Delhi routes. Care Travel then applied to this figure an estimated percentage of sales to the Indian subcontinent attributable to only the Karachi and Bombay routes, since those were the destinations to which Care Travel claimed a contractual exclusive. In doing so, appellee again relied on Pan Am's own documents.[7] Care Travel then calculated a commission rate that it would have earned as an exclusive GSA and applied this rate to the sales figures for the Karachi and Bombay markets. In order to arrive at its net lost profit, Care Travel then calculated and subtracted the actual income it received on sales made during the relevant period and the costs avoided on the sales not made.[8]

Appellant takes issue with the two major assumptions or estimations made by Care Travel in its damage calculations; namely that Care Travel, if it had been the exclusive GSA, would have received a 12% commission and would have sold all of the Pan Am tickets sold by Empire Travel to Karachi and Bombay. The mere fact that appellant disagrees with the methodology utilized by Care Travel in arriving at its 12% commission rate or Care Travel's assumption that all of Empire Travel's sales to

---

**6.** In the present action, appellant appears only to challenge the alleged failure of Care Travel to provide proof of its damages with the requisite "reasonable certainty."

**7.** In fact, the $9 million figure arrived at by Care Travel for the total sales volume that one Pan Am GSA servicing Bombay and Karachi on an exclusive basis would have achieved was more conservative than the $10–12 million figure contained in Pan Am's own internal documents. Specifically, Mr. Witt, a Pan Am official, wrote:

> Empire/Care/Cambata will all promise 10 to 12 million [dollars] if they are given the GSA

on an exclusive basis, and *I feel sure* with the right conditions of allocation and blind eye to some degree of malpractice this would be true.

**8.** Given Care Travel's damage proof, the jury was supplied with a "basis for multiple mathematical calculations capable of determining with some specificity the financial repercussions of [defendant's] breach." *Lexington Products, Ltd. v. B.D. Communications, Inc.*, 677 F.2d 251, 254 (2d Cir.1982). Similarly, plaintiff in the instant case had "a track record of … sales before [defendant's] breach." *Id.* These factors distinguish the present case from *Kenford*.

Karachi and Bombay would have neatly transferred to Care Travel does not render Care Travel's proof speculative.

Moreover, Pan Am, and the trial judge, vigorously challenged and Care Travel defended the assumptions underlying its damage proof. With respect to the 12% commission rate, Pan Am argued that the correct figure that should have been applied was the actual 2.67% profit margin Care Travel obtained during the October 1984– April 26, 1985 period prior to the alleged breach. In response, Care Travel's damage witness presented a reasonable explanation as to why this figure was rejected as irrelevant. Specifically, the witness explained that the time period during which the 2.67% return was obtained included the overlap period during which both of Pan Am's GSAs were selling tickets to the same destinations. Accordingly, the witness explained that since Care Travel was not acting on an exclusive basis during this period, the 2.7% did not establish the proper profit margin for an exclusive Pan Am GSA.

With respect to the tickets that Care Travel would have sold had it been the exclusive GSA, Pan Am's witness, Ramon Evans, testified that, in his "personal belief," 100% of Empire Travel's sales to Bombay and Karachi would not have been transferred to Care Travel. Mr. Evans theorized that the entry of two GSAs competing for sales to the same destinations expanded the market to these destinations and, thus, without such competition Care Travel would have sold less tickets as an exclusive GSA than it did in competition with Empire Travel.

Earlier in the trial, Judge Griesa similarly and quite vigorously challenged Care Travel's witness on his assumption that all of the tickets that Empire Travel sold to Bombay and Karachi would have been sold by Care Travel. Indeed, in response to the trial judge's line of questioning, Care Travel's damage witness, Mark Pickering, conceded that the price war between Care Travel and Empire Travel could have increased sales volume and that, absent the price war, sales may have been less than it was when both GSAs were competing. In addition, the trial judge's questions to Pickering suggested that Care Travel might not have captured all of Empire Travel's sales since the two GSAs did not utilize all the same subagents.

Admittedly, Care Travel's responses to these challenges were not completely convincing. However, the alleged inadequacy of the responses does not make Care Travel's damage proof speculative. Rather, given the extent of Care Travel's damage proof, we believe that the trial court was well within the proper bounds to submit the damages issues to the jury. *S & K Sales Co. v. Nike, Inc., supra,* 816 F.2d at 853; *F.H. Krear & Co. v. Nineteen Named Trustees,* 810 F.2d 1250, 1260 (2d Cir.1987).

Moreover, Care Travel's damage presentation concluded with a request for $970,-846.00. The jury awarded Care Travel $563,858.00. The compromise nature of the verdict gives rise to an inference that the jury considered both parties' arguments and attempted to arrive at a reasonable estimate of appellee's damages.

Finally, we deal with Pan Am's objections to the propriety of the damage instruction given to the jury. Pan Am claims that the charge as it related to damages lacked the clarity required to give the jury an adequate understanding of the law and how it should be applied to the evidence. The appellant specifically cites the trial court's failure to inform the jury that, if liability was found, the damages plaintiff was seeking were its lost profits, the court's failure to discuss how lost profits should be calculated and, finally, the court's failure to inform the jury that it may not speculate in awarding damages.

Pursuant to Fed.R.Civ.P. 51, "[n]o party may assign as error the giving or failure to give an instruction unless the party objects thereto … stating distinctly the matter objected to and the grounds of the objection …" An exception may be made only when there is "plain error," that is, "where the error may result in a miscarriage of justice or in obvious instances of misapplied law." *Earl v. Bouchard Transp. Co.,* 917 F.2d 1320, 1324 (2d Cir.1990); *see also Proteus Books Ltd. v. Cherry Lane Music Co.,* 873 F.2d 502, 514 (2d Cir.1989).

In this case, the Court spent a great deal of time discussing the charge with counsel and seeking their input. Despite ample opportunity to raise objections to the charge, counsel did not raise the issues they now press on appeal.

At the conference prior to submission of the charge, Judge Griesa explained in detail how he would instruct the jury to calculate damages if they deemed such an award proper:

> If they find a breach of promise or breach of contract, they will be entitled to consider the damages as a question of fact considering it, however—and this is very important for the plaintiff because I don't want to have to contradict you— they have to consider it in terms of what were the damages, if any, flowing from a breach of contract. That is not the same as saying what would my profits have been during the time I was performing a contract.
>
> In other words, if they find that Evans promised to remedy the breach and failed to keep that promise what damages flowed from that.
>
> In other words, I will tell the jury the standard is what do they find as a fact that Care would have been entitled to make had Evans kept his promise. That is not the same as finding what would Care's profit have been during the time of this promised arrangement. I think you can argue it but it's not the same and you'll have to be careful about that.

Appellant objected only to the extent of arguing that damages should be limited to the 90–day notice period and arguing that Care Travel was a new business and, therefore, in awarding damages, the jury must avoid speculation because "to measure damages for that type of entity is much stricter than if it was an ongoing business that had a history." As the above discussion of those issues demonstrates, the Court properly rejected these instructions.

Appellant did not specifically object to the trial court's determination that the recoverable damages were not necessarily "lost profits." Accordingly, appellant's current objections to the damage instructions were not preserved for appeal. *Kelco*

*Disposal, Inc. v. Browning–Ferris Industries of Vermont, Inc.*, 845 F.2d 404, 409 (2d Cir.1988).

■ In any event, we find the district court's charge adequate even if the "plain error" standard of review is not applied. If such a standard is not applied, a jury instruction will be deemed adequate, so long as the charge, taken as a whole, "is correct and sufficiently covers the case so that a jury can intelligently determine the questions presented to it." *Fernandez v. Fitzgerald*, 711 F.2d 485, 487 (2d Cir.1983) (quoting *Oliveras v. United States Lines Co.*, 318 F.2d 890, 892 (2d Cir.1963)). *See also Carvel Corp. v. Diversified Management Group, Inc.*, 930 F.2d 228, 231 (2d Cir.1991) ("As a general rule, we will not upset a judgment because of an error in jury instructions if the charge given was correct and sufficiently covered the essential issues"); *New York v. Pullman, Inc.*, 662 F.2d 910, 917 (2d Cir.1981) (charge sufficient if, "taken as a whole, is fundamentally fair"), *cert. denied*, 454 U.S. 1164, 102 S.Ct. 1038, 71 L.Ed.2d 320 (1982); *Norfleet v. Isthmian Lines, Inc.*, 355 F.2d 359, 362–63 (2d Cir.1966) (charge sufficient if, "taken as a whole and viewed in light of the evidence, shows no tendency to confuse the jury as to the principles of law which are applicable"); *Franks v. United States Lines Company*, 324 F.2d 126, 127 (2d Cir.1963) (charge sufficient if it assures a party "a fair consideration of all his theories"). Thus, perfection is not expected. *Evans v. Transportacion Maritime Mexicana SS "Campeche"*, 639 F.2d 848, 860 (2d Cir.1981). Moreover, a trial court has discretion in the style and wording of jury instructions. *Franks, supra*, 324 F.2d at 127. Accordingly, the court is not obliged to use the exact words proposed by a party. *Pullman, supra*, 662 F.2d at 917.

Applying the above principles to our review of the record convinces us that the trial judge's damage instructions adequately reflected the pertinent law and enabled the jury to decide the issues intelligently. The court's charge instructed the jury to ask "what loss did Care suffer from the breach of contract, if it occurred" and "what would Care have gained had the contract or the promise been carried out."

Transcript, p. 571. The charge also informed the jury that "you are trying to ... put Care into the position it would have been had the promise or contract been carried out." *Id.*

Further, the Court reminded the jury that, although "there is really no way of knowing to a certainty what the [damages are]," nevertheless:

you are not left totally in the dark by any means.

You've got a lot of evidence about what Pan Am's business was there, what sales ability Care Travel had in the United Kingdom in its market. You have a lot of evidence about the stability of Care Travel and any related companies as business entities. This is not a situation where the Care Travel people were about to fail or something like that.

Moreover, as appellant requested, the trial court instructed the jury that,

in making a reasonable estimation ... [y]ou can consider, among other things, the right of Pan American to terminate on 90 days' notice but you can also consider whether Pan Am, if they had carried out their promise, if you find there was a breach of the promise, you can consider what would Pan Am have done had they carried out the promise. It is a factual question for you, which you can reasonably appraise. Had they given Care the exclusive right to sell to these gateways, would they have terminated Care in 90 days' notice? It is a factual question for you. Or would they have gone on for some reasonable period of time dealing with Care on an exclusive basis.

Thus, while the jury was not specifically instructed that it should refrain from speculation,[9] the charge guided the jury on how to use the evidence to calculate a damage award. In short, we find that the charge, taken as a whole, "adequately acquainted the jurors with appellant's theory of the case," *Fernandez v. Fitzgerald, supra,* 711 F.2d at 488, and allowed the jury to make an informed, reasonable estimate of the

damages suffered by Care Travel. Accordingly, we reject appellant's challenges to the jury instructions.

### CONCLUSION

For the reasons discussed above, we affirm the judgment of the trial court in all respects.

Affirmed.

---

**9.** As noted above, appellant did not ask for a general charge that the jury should not refrain from speculation. This language was raised

solely in the context of Pan Am's flawed argument that Care Travel was not a new venture.