423 F.3d 145
 Elliott WALDMAN, as Trustee for the Elliott Waldman Pension Trust, on behalf of himself and all others similarly situated Plaintiff-Appellee,
v.
Robert RIEDINGER Claimant-Appellant,
Frank M. Liguori, Miriam Olsten, William Olsten, Stuart Olsten, Anthony Puglisi, and Olsten Corporation, Defendants.
Docket No. 04-2988-CV.
 United States Court of Appeals, Second Circuit.
 Argued: April 29, 2005.
 Decided: September 12, 2005.
 
 Bruce Jackson, Jackson & Tyler, Atlanta, GA (Joseph Lawrence Clasen, Robinson & Cole, LLP, New York, NY, on the brief), for Claimant-Appellant.
 James G. Flynn (Robert I. Harwood, Daniella Quitt, on the brief), Wechsler Harwood LLP, New York, N.Y. (Faruqi & Faruqi, LLP, New York, N.Y. on the brief), for Plaintiff-Appellee.
 Before: SOTOMAYOR, B.D. PARKER, HALL, Circuit Judges.
 B.D. PARKER, JR., Circuit Judge.
 
 
 1
 Robert Riedinger appeals from a final judgment of the United States District Court for the Eastern District of New York (Hurley, J.), denying his claim for participation in a class action settlement on the ground that he held the wrong type of common stock. Because we conclude that the district court erred in interpreting provisions of the settlement agreement governing eligibility for participation, we reverse and remand.
 
 BACKGROUND
 
 2
 Elliott Waldman ("the Trustee"), as trustee for his pension plan and on behalf of other stockholders of the Olsten Corporation ("Olsten"), a Delaware corporation, commenced a class action against Olsten and several of its officers and directors, claiming that they violated federal securities laws through a series of misstatements and omissions that artificially inflated the market price of Olsten's stock.[1] In August 2001, the district court approved a $24.1 million settlement and, at the same time, certified a class consisting of "all persons and entities that purchased shares of common stock of Olsten Corporation (`Olsten') from February 5, 1996 through July 22, 1997, inclusive (the `Class Period')." Certain categories of stockholders were excluded, namely, the "defendants, their affiliates, subsidiaries, members of their immediate families, [and their] successors and assigns." The district court drew its definition of the class from the Stipulation of Settlement ("Settlement Agreement" or "Agreement") signed by the parties to the underlying litigation. The Settlement Agreement drew no distinction between Olsten's two classes of common stock: Common Stock and Class B Common Stock. Pursuant to the Agreement, a Claims Administrator mailed notices of the settlement and proofs of claim to members of the class.
 
 
 3
 In October 2001, Riedinger received, unsolicited, the notice and a blank proof of claim, which he completed and returned. His claim indicated that he had acquired 225,000 shares of Olsten "Class B Common Stock" within the Class Period. Riedinger, who is the nephew of Olsten's founder, William Olsten, had acquired these shares in 1996 when Olsten purchased Riedinger's wholly-owned franchise, Olsten of Georgia, Inc., in exchange for the shares. The stock was purchased at about $32.375 per share, making the shares worth more than $7 million at the time of closing.[2] Within weeks of the closing, the price of Olsten stock began to fall precipitously. By December 31, 1996, Riedinger's stock was allegedly worth less than half its original value. He alleges that this decline "financially devastated" him and was due to the "gross acts of fraud" by Defendants that were the subject of the underlying litigation. Br. of Claimant-Appellant at 5.
 
 
 4
 The Claims Administrator denied Olsten's claim on the ground that the term "common stock," as used in the settlement, referred only to Olsten "Common Stock," not to "Class B Common Stock."[3] Olsten's Certificate of Incorporation provides for two classes of common equity securities: Common Stock and Class B Common Stock. The Common Stock was publicly traded and voted on a one-vote-per-share basis. By contrast, the Class B Common Stock had no established public trading market, was restricted stock, and was entitled to ten votes per share. Because Riedinger was a holder of Class B Common Stock, the Claims Administrator concluded that he was not a member of the class and disallowed his claim. Riedinger sought relief from the district court.
 
 
 5
 After considering the "common stock" question, as well as whether Riedinger was an affiliate of the defendants, the district court found that because the Settlement Agreement, which referred only to "common stock," "fail[ed] to differentiate the two types of common stock," the district court could not "conclude that the Settlement Agreement excludes recovery by owners of Class B common stock." The district court also noted that the Settlement Agreement did not define the term "affiliate" and requested further briefing on the issue.
 
 
 6
 After receiving additional briefing, on April 16, 2004, the district court denied Riedinger's claim on both grounds. First, the district court reversed its previous conclusion that Riedinger owned "common stock," noting that the Trustee had submitted, "unprompted, new evidence regarding the distinction between Common Stock and Class B Common Stock," which demonstrated that "the term `Common Stock,' as it was utilized in the Settlement Agreement, did not include Class B Common Stock." The district court concluded that the consistent usage of the terms "Common Stock," in contrast with "Class B Common Stock," in Olsten's Certificate of Incorporation, proxy statements, and SEC filings (the "corporate documents") "trump[ed] the dictionary definition urged by Riedinger."[4]
 
 
 7
 Second, the district court found that Riedinger was an "affiliate" within the meaning of the Settlement Agreement. The district court relied on the definition of "affiliate" under the Securities Act of 1933 (the "1933 Act") and the Securities Exchange Act of 1934 (the "1934 Act"), both of which look to whether the person in question exercises "control" over a party who is alleged to have committed securities fraud. See 15 U.S.C. § 78a et seq.; 15 U.S.C. § 77a et seq.; 17 C.F.R. §§ 240.13e-3(a)(1), 230.404, 230.405. The district court concluded that Riedinger "controls or is controlled by one of the Defendants" because he was a trustee of four trusts, which together contained more than five million shares of Class B Common Stock. The trusts had been established by the will of Riedinger's late uncle, William Olsten, for the benefit of his wife (Defendant Miriam Olsten, a director of Olsten), his son (Defendant Stuart Olsten, a director, vice-chairman and the president of Olsten), his daughter, and descendants. William Olsten died in 1992, and each trust, with the exception of the descendants', was assigned three trustees, one of whom was Riedinger.[5] The district court held that because, as one of the trustees, Riedinger shared in voting and investment power of Olsten stock with Defendants Miriam and Stuart Olsten, he possessed control within the meaning of the SEC regulations. The district court also noted that on August 17, 1999, Riedinger had signed a voting agreement with the individual Defendants and others to effectuate a merger between Olsten and Adecco. "Through this agreement," the district court said, "Riedinger actually exercised control." Accordingly, the district court denied his claim.
 
 
 8
 This appeal ensued.
 
 DISCUSSION
 
 9
 "We review a district court's interpretation of a settlement agreement de novo ... mindful that the consent decree is a contract between the parties, and should be interpreted accordingly." Tourangeau v. Uniroyal, Inc., 101 F.3d 300, 307 (2d Cir.1996) (citations omitted). This appeal requires us to consider the district court's interpretation of two terms of the Settlement Agreement: "common stock" and "affiliates."
 
 
 10
 I. "Common Stock"
 
 
 11
 Riedinger argues that the district court erred in concluding, based on Olsten's corporate documents, that the Settlement Agreement's reference to "common stock" excluded holders of Class B Common Stock. He contends that it was error to look beyond the plain meaning of the term "common stock" when that term is unambiguous. We agree.
 
 
 12
 Whether we apply New York or Delaware law, the same principles of contract interpretation guide our construction of the Agreement.[6] "[I]f a contract is unambiguous on its face, the parties' rights under such a contract should be determined solely by the terms expressed in the instrument itself rather than from extrinsic evidence as to terms that were not expressed or judicial views as to what terms might be preferable." County of Suffolk v. Alcorn, 266 F.3d 131, 138 (2d Cir.2001) (applying New York law); see Eagle Indus., Inc. v. DeVilbiss Health Care, Inc., 702 A.2d 1228, 1232 (Del.1997) (pronouncing same rule under Delaware law). Importantly, the determination of whether contract language is unambiguous "is made by the court with reference to the contract alone." Care Travel Co. v. Pan Am. World Airways, Inc., 944 F.2d 983, 988 (2d Cir.1991) (citing W.W.W. Assocs. v. Giancontieri, 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 566 N.E.2d 639 (1990)); see Eagle Indus., 702 A.2d at 1232. Contract language is unambiguous when it has "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." Care Travel, 944 F.2d at 988 (internal quotation marks omitted); see Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co., 616 A.2d 1192, 1195-96 (Del.1992). In general, we accord an unambiguous term its ordinary meaning. See United States v. Broad. Music, Inc., 275 F.3d 168, 175 (2d Cir.2001) (To the extent a term is unambiguous, "deference is to be paid to the plain meaning of the language of a decree and the normal usage of the terms selected.") (internal quotations omitted); see Rhone-Poulenc, 616 A.2d at 1195 ("Clear and unambiguous language ... should be given its ordinary and usual meaning.").
 
 
 13
 Looking only at the face of the contract, as we must, we perceive no ambiguity in the term "common stock." The Agreement states that "persons and entities that purchased shares of common stock of Olsten Corporation" during the Class Period are class members. The term's meaning is definite and readily ascertainable. See Black's Law Dictionary (8th ed.2004) (defining "common stock" as "[a] class of stock entitling the holder to vote on corporate matters, to receive dividends after other claims and dividends have been paid ..., and to share in assets upon liquidation"). Indeed, the parties to the Agreement apparently believed it was so easily understood that they did not see the need to define it.
 
 
 14
 The Trustee argues that the use of "Common Stock," as distinguished from "Class B Common Stock," in Olsten's corporate documents trumps the plain meaning urged by Riedinger. In its April 16, 2004 order, the district court accepted this argument, holding that "new evidence regarding the distinction between Common Stock and Class B Common Stock" revealed that "the term `Common Stock,' as it was utilized in the Settlement Agreement, did not include Class B Common Stock." Under both New York and Delaware law, however, "extrinsic ... evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face." W.W.W. Assocs., 77 N.Y.2d at 163, 565 N.Y.S.2d 440, 566 N.E.2d 639 (citation omitted); see Eagle Indus., 702 A.2d at 1232 ("If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity."). The determination of whether contract language is unambiguous "is made by the court with reference to the contract alone." Care Travel, 944 F.2d at 988; see Eagle Indus., 702 A.2d at 1232. Accordingly, we are not prepared to permit extrinsic evidence to influence our interpretation of a contract term that is clear.
 
 
 15
 We further note that the drafters of the Settlement Agreement could have, but did not, draw distinctions among common stockholders. Given that equity issuers frequently divide common stock into classes, and given the Trustee's conceded awareness that Olsten had more than one class of common stockholders, it would have been easy to specify in the Agreement which classes of common stockholders, if any, were meant to be excluded. Moreover, the Trustee's act of sending Riedinger notice of the settlement and a blank proof of claim is inconsistent with the Trustee's contention that Class B Common Stock shareholders were never intended to be class members. As the Claims Administrator admitted, notice was sent "to all persons and entities who purchased the common stock of Olsten during the period from February 5, 1996 through and including July 22, 1997." That Riedinger received notice strongly suggests that he was originally thought to be a holder of "common stock." For all of these reasons, we conclude that the term is unambiguous and that it should be accorded its "ordinary and usual" meaning—a meaning that clearly embraces Riedinger's Class B shares. Rhone-Poulenc, 616 A.2d at 1195.
 
 
 16
 Even assuming arguendo that "common stock" is ambiguous and that the district court properly looked beyond the text of the Agreement, the corporate documents do not support the conclusion that holders of Class B shares are excluded from class membership; in fact, they point in the other direction. See Care Travel, 944 F.2d at 988 (extrinsic evidence may be used once a court determines that a contract term is ambiguous); Eagle Indus., 702 A.2d at 1232. While the Settlement Agreement consistently refers to "common stock" in lower-case letters, the class of securities known as "Common Stock," as distinguished from "Class B Common Stock," is capitalized throughout the corporate documents. In giving weight to the corporate documents, the district court overlooked this disparity and the fact that the Certificate of Incorporation explicitly refers to both "Common Stock" and "Class B Common Stock" as "common stock." Paragraph Fourth, subsection (C) of the Certificate of Incorporation states, "The powers, preferences and relative, participating, optional or other specific rights and the qualifications, limitations or restrictions hereof, of each class of common stock of the Corporation are as follows[.]" (emphasis added). Subsection (C) then identifies the characteristics of Common Stock and Class B Common Stock—both of which fall under the general rubric of lower-case "common stock," the precise capitalization used in the Settlement Agreement. In this way, the Certificate firmly supports Riedinger's bid for class membership. For these reasons, we find no ambiguity in the term "common stock;" even if we could, we still believe the district court erred in holding that Class B Common Stock was not "common stock."
 
 
 17
 II. "Affiliates"
 
 
 18
 The district court held that Riedinger's claim was also barred because he was an "affiliate" of the defendants—a category of stockholder that the Settlement Agreement excludes from class membership. We hold that Riedinger does not qualify as an affiliate because he neither controlled nor was controlled by any of the defendants.
 
 
 19
 The parties agree that because the term "affiliate" is not defined in the Settlement Agreement, it is appropriate to look to the definition provided in regulations promulgated under the 1933 and 1934 Acts. The definitions under the two statutes are virtually identical. Under Rule 405 of the 1933 Act and under Rule 12b-2 of the 1934 Act:
 
 
 20
 An "affiliate" of, or person "affiliated" with, a specific person, is a person that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the person specified.[7]
 
 
 21
 17 C.F.R. § 230.405; 17 C.F.R. § 240.12b-2.
 
 Under the same regulations:
 
 22
 The term "control" (including the terms "controlling," "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.
 
 
 23
 17 C.F.R. § 230.405; 17 C.F.R. § 240.12b-2.
 
 
 24
 Applying these definitions, the key question is whether Riedinger had the power to direct the management and policies of one of the defendants through his position as a trustee of several Olsten family trusts.[8] We need not decide whether, to be an affiliate, it was enough for Riedinger to have the potential to control a defendant, or whether he actually had to exercise control, for we conclude that Riedinger possessed neither potential nor actual control.
 
 
 25
 At the time relevant to the settlement, the only defendants with whom Riedinger could conceivably have had some affiliation by virtue of his position as a trustee were Miriam and Stuart Olsten—beneficiaries of two of the trusts—and Olsten Corporation.[9] Without specifying which defendant(s) Riedinger controlled, the district court concluded that he had the requisite control to be an affiliate by virtue of his "trustee relationship with certain Defendants." Because Riedinger "shared in voting an[d] investment power," the district court found he "possessed control, within the definition of the SEC regulations, over the stocks of certain individual Defendants." The district court also found that through Riedinger's act of signing a 1999 voting agreement to consummate the merger between Olsten and Adecco, he "actually exercised control." Appellee emphasizes that because of Riedinger's role as trustee to four trusts that contained Class B Common Stock, he shared voting and investment power over more than 5 million Olsten Class B shares—between 37% and 43.9% of all Class B Common Stock.
 
 
 26
 Although these numbers are impressive, in fact, Riedinger lacked control over any of the defendants because of a single, critical provision of William Olsten's will. Article FOURTEENTH, Section C provides:
 
 
 27
 If, at any time that my spouse, MIRIAM OLSTEN, shall be acting as one of my Fiduciaries, there shall be a difference of opinion among my Fiduciaries with respect to any matter relating to Olsten Corp. and/or any successor to it, including without limitation, the voting of its stock on any matter, the exercise or non-exercise of any power, authority or discretion granted to any of them hereunder, and a determination as to whether or not to sell or otherwise dispose of any or all of its stock, the determination of my said spouse with respect to said matter shall be controlling and shall be binding upon all persons interested in my estate and in any trust created hereunder.
 
 
 28
 This provision effectively afforded Miriam Olsten absolute control over all Olsten stock in William Olsten's estate. As a result, while Riedinger may have been a trustee in name, he did not possess the power necessary to "direct or cause the direction of the management and policies of a person."[10] 17 C.F.R. § 230.405; 17 C.F.R. § 240.12b-2.
 
 
 29
 Riedinger's lack of potential power parallels the absence of any evidence that he actually exercised control over any defendant. Riedinger attests that he was "never consulted as to the actions of the trusts or even informed as to any of the meetings of the trustees," and the Trustee has pointed to no evidence—other than the 1999 Adecco/Olsten merger—contradicting Riedinger's claim that he was essentially ignored by the other trustees.
 
 
 30
 The district court cited Riedinger's signature on the Adecco merger agreement as evidence that Riedinger actually exercised control, but this argument is unpersuasive. First, the Trustee has not directed us to anything in the record establishing that the absence of Riedinger's signature would have made any difference to whether the merger occurred. Second, the Adecco/Olsten merger occurred in 1999, two to four years after the alleged fraud that was the subject of the underlying litigation. Thus, even if the merger agreement suggests that Riedinger at some point participated in the management of Olsten—a fact that has not otherwise been demonstrated—he did not do so until well after the time period material to the Settlement Agreement.
 
 
 31
 Finally, our conclusion that Riedinger was not an "affiliate" finds support in the apparent purpose of the Settlement Agreement's exclusion of affiliates: to ensure that those who perpetrated, or otherwise profited from, the alleged fraud would not benefit from the settlement. In light of this objective, the claim that Riedinger must be disqualified because he is an affiliate is a particularly odd one. No claims of wrongdoing by Riedinger were made by class counsel, who presumably delved closely into the matter. Moreover, Riedinger sold his business to Olsten for $7 million in stock and, within a relatively short period, the shares he received had lost nearly half their value. This decline occurred during the events that were the subject of the complaint. His losses apparently make him the single largest victim of the fraud alleged in the complaint. Rather than profiting from the alleged fraud, as an affiliate might have done, Riedinger was victimized by it. For this reason as well, we cannot conclude that he was an affiliate.
 
 CONCLUSION
 
 32
 Accordingly, the judgment of the district court is REVERSED. The case is REMANDED for further proceedings consistent with this opinion.
 
 
 
 Notes:
 
 
 [1]
 Olsten is now known as ADO Staffing, Inc., a wholly-owned subsidiary of Adecco S.A. Because the litigation concerns alleged actions taken by Olsten's officers and directors before the Adecco merger, this opinion will refer to the corporation as Olsten
 
 
 [2]
 Appellee disputes this calculation of Riedinger's stock value because Class B Common Stock is not traded on a public market, and thus, Appellee claims, has an indeterminate value. We leave it to the district court and Claims Administrator to resolve disputes over the valuation of class members' shares
 
 
 [3]
 The varying capitalization of "common stock" throughout this opinion is deliberate and is designed to clarify the distinction between the language of the Settlement Agreement, which refers to "common stock," and the specific class of securities called "Common Stock."
 
 
 [4]
 The district court also determined that even though Class B Common Stock is freely convertible to Common Stock, the two classes of securities are not "legally equivalent," and thus, "ownership of unconverted Class B Common Stock does not entitle [Riedinger] to make a claim under the Settlement Agreement." Riedinger does not pursue this argument on appeal
 
 
 [5]
 The trust for the descendants was assigned only two trustees: Riedinger and Andrew Heine, a director of Olsten. The co-trustees of the other trusts were (1) the respective beneficiary, (2) Heine, and (3) ReidingerSee N.Y. Est. Powers & Trusts Law § 7-2.2(c)(3).
 
 
 [6]
 Because the Settlement Agreement specifies that it "shall be governed by and construed in accordance with the laws of the State of New York as applied to agreements negotiated," it seems most appropriate to apply New York lawSee Lauritzen v. Larsen, 345 U.S. 571, 588-89, 73 S.Ct. 921, 97 L.Ed. 1254 (1953) ("Except as forbidden by some public policy, the tendency of the law is to apply in contract matters the law which the parties intended to apply."). Appellee contends, however, that Delaware law applies because Delaware is the place of incorporation and New York's choice-of-law rules dictate that the law of the state of incorporation governs the internal affairs of the corporation. Although we are skeptical of Appellee's position given that the issue before us is one of contract interpretation and not corporate governance, we need not decide which state's law applies, for Delaware contract law does not differ materially from New York contract law with respect to the questions here at issue.
 
 
 [7]
 The only difference between the definition of "affiliate" in Rule 405 of the 1933 Act and the definition of "affiliate" in Rule 12b-2 of the 1934 Act is the omission of the internal quotation marks in Rule 405 of the 1933 Act
 
 
 [8]
 Appellee does not seriously contend that Riedinger's personal ownership of 225,000 Class B shares qualifies him as an affiliate
 
 
 [9]
 Because William Olsten's daughter and descendants are not defendants, Riedinger's position as trustee with respect to their trusts is relevant only insofar as it could have made him an affiliate of Olsten Corporation
 
 
 [10]
 We also decline to find that Riedinger was "controlled by" Miriam Olsten because while Article FOURTEENTH, Section C certainly afforded her control over Olsten, it did not provide her control over Riedinger. 17 C.F.R. § 230.405; 17 C.F.R. § 240.12b-2