7 F.3d 1091
 17 Employee Benefits Cas. 1917
 Richard E. SAYERS, Plaintiff-Appellant,
v.
The ROCHESTER TELEPHONE CORPORATION SUPPLEMENTAL MANAGEMENT
PENSION PLAN; William H. Cherry; James B. Loughlin;
Joanne H. Miller; Donna L. Reeves-Collins; Kenneth P.
Schirmuhly; Mary L. Sickel, as Members of the Rochester
Telephone Corporation Employees' Benefit Committee;
Rochester Telephone Corporation, Defendants-Appellees.
 No. 1650, Docket 93-7217.
 United States Court of Appeals,
Second Circuit.
 Argued June 18, 1993.
Decided Oct. 28, 1993.
 
 Kenneth A. Payment, Rochester, NY (A. Paul Britton, Harter, Secrest & Emery, of counsel), for plaintiff-appellant.
 William D. Eggers, Rochester, NY (Nixon, Hargrave, Devans & Doyle, of counsel), for defendants-appellees.
 Before: CARDAMONE and MAHONEY, Circuit Judges, and CEDARBAUM, District Judge.*
 CARDAMONE, Circuit Judge:
 
 
 1
 This appeal requires an interpretation of a contract between a telephone company and one of its high-level executives, Richard E. Sayers, who thinks this a classic case of lawyers negotiating the language of a deal, the parties signing it, and then its validity and meaning being left to be later contested. Perhaps it is true that everything that can be said or written can be said or written clearly; certainly the parties before us on this appeal think their written agreement is clear and unambiguous. But, in light of the claimed clarity, surprisingly each of them interprets the writing differently. Hence, as is the case with so many litigated disputes, this appeal arises from the unclear use of words.
 
 BACKGROUND
 
 2
 Sayers worked for appellee Rochester Telephone Corporation, based in Rochester, N.Y. (Rochester Tel), from 1968 to 1990, and most recently had held the position of Executive Vice President of the company's Telecommunications Group. That changed in 1990 when his employer forced Sayers to retire. On June 1, 1990 the parties executed a Retirement Agreement to govern his departure. Under its terms, Sayers received $50,000 in exchange for a release of all claims against Rochester Tel. The company also agreed to pay him $255,000 in two installments in exchange for his promise not to compete against his former employer for two years and not to divulge confidential company information for an indefinite period. Section 2 of the Retirement Agreement defined forbidden competitive activity and set forth the geographic areas to which the noncompete clause applied.
 
 
 3
 Sayers also was entitled to retirement benefits under the terms of Rochester Tel's Supplemental Management Pension Plan (Plan), which the company established in 1984 for high-level employees. Under § 3.1 of the Plan Sayers agreed that if he engaged in "any activity inimical to the interests" of Rochester Tel for three years following his retirement without the consent of Rochester Tel's Board of Directors, he would forfeit all retirement benefits.
 
 
 4
 Appellant states he was troubled about how the two contracts--the Retirement Agreement with its two-year ban on competition and the Plan with its three-year prohibition on inimical activity--could be read together consistently. To meet this concern the parties included the following Rider to the Retirement Agreement:
 
 
 5
 Sayers acknowledges that, except to the extent set forth in this paragraph of this Section 3 [Default], Company may terminate Sayer's benefits under the [Plan] if Sayers engages in any activity inimical to the interests of Company, as and to the extent provided in the [Plan]; provided, however, that Company may not terminate such benefits because Sayers either engages, directly or indirectly, in any capacity, or assists another to engage in any work or activity in any way connected with the development, manufacture or sale of any product or service, so long as Sayers does not, by so engaging or assisting another to engage in such work or activity, violate the provisions of Section 2 of this Agreement.
 
 
 6
 Sayers' attorney drafted this language after rejecting a similar draft offered by Rochester Tel's counsel. With the inclusion of the Rider, the Retirement Agreement was complete. It was signed by two Rochester Tel executives--its President and Chief Executive Officer and its Executive Vice President and President of the Telecommunications Group.
 
 
 7
 Appellant stopped working at the company in June 1990, but he continued on paid leave through December 18, 1990, when his retirement officially began. From the fall of 1990 until mid-1992 Sayers worked as an independent consultant for cellular telephone companies overseas and in the states of Kentucky and Michigan. On several occasions he checked with executives of his former employer before accepting consulting assignments to ensure that he would not violate the Retirement Agreement's noncompete clause. In one case he declined to take on a project because Rochester Tel expressed reservations about his doing it.
 
 
 8
 On August 5, 1992--more than two years after he left the company--appellant accepted a position as President and Chief Operating Officer of ACC Corp., a telecommunications company based in Rochester. Before taking the position, he asked Rochester Tel to approve the move. Both the Employees' Benefit Committee, which directly administers the Plan, and the company's Board of Directors refused Sayers' request in June and July 1992, respectively. They determined that the proposed job with ACC Corp. would be inimical to Rochester Tel's interests and contrary to the Plan. On September 1, 1992 the company stopped paying retirement benefits to Sayers, declaring that he had violated the Plan's three-year ban on inimical activity.
 
 
 9
 Invoking jurisdiction under the civil enforcement provision of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1132(e)(1) (1988), Sayers filed suit against Rochester Tel on October 5, 1992 in the United States District Court for the Western District of New York (Telesca, C.J.). In his complaint Sayers sought to recover benefits due and owing him under the Plan and to clarify his right to future benefits under it. Plaintiff contended that the Rider to the Retirement Agreement reconciled that contract and the Plan so that he was required to refrain from competitive activity for only two years. Rochester Tel claimed the Rider did not change the Plan, but merely clarified the meaning of "inimical activity" in it. Both parties then moved for summary judgment based on the language of the contracts. In an opinion dated February 25, 1993 the district court adopted Rochester Tel's view of the contract and granted summary judgment in its favor. Sayers appeals. We reverse.
 
 DISCUSSION
 A. Contract Ambiguity
 
 10
 Both parties contend the language of the Retirement Agreement is clear and unambiguous, yet urge opposing interpretations of it. According to Sayers, the Retirement Agreement Rider stipulated what the meaning of inimical conduct was under the Plan with regard to competitive activity. In his view, Rochester Tel can terminate his pension benefits under the Plan for competitive activity only if he engaged in that activity within two years of retirement. That is to say, only if he violated § 2 of his Retirement Agreement. In contrast, Rochester Tel insists the Rider merely clarifies that Sayers could engage in telephone business that was either outside Rochester Tel's territory or not competitive with the company's products and services at any time after retirement without being bound by either the Retirement Agreement's noncompete clause or the Plan's inimical activity clause. Under this reading the Plan's three-year ban on inimical activity still embraces competitive activity undertaken in Rochester Tel's territory, and Sayers, the company asserts, violated that clause.
 
 
 11
 Faced with these conflicting views, the district court held the contracts unambiguously supported Rochester Tel's interpretation because it "is reasonable, is consistent with the rest of the [default] Section and with the [Retirement] Agreement, and does no violence to the [Plan] which it references." In the alternative, the district court held that Rochester Tel's "unrebutted" affidavit testimony concerning the parties' intent amply supported the company's view. Sayers disputes both reasons advanced by the trial court in support of its grant of summary judgment.
 
 
 12
 Our review of such a grant is de novo, employing the same tests as those applied at the district court. See Taggart v. Time Inc., 924 F.2d 43, 45-46 (2d Cir.1991). We of course may not resolve disputed issues of fact, but instead must determine whether there are genuine issues of fact to be resolved at trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).
 
 
 13
 The legal principles governing this dispute are familiar and well settled. The primary objective in contract interpretation is to give effect to the intent of the contracting parties "as revealed by the language they chose to use." Seiden Assocs. v. ANC Holdings, Inc., 959 F.2d 425, 428 (2d Cir.1992); accord, Care Travel Co. v. Pan American World Airways, Inc., 944 F.2d 983, 987 (2d Cir.1991); W.W.W. Assocs. v. Giancontieri, 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 566 N.E.2d 639 (1990); Hartford Accident & Idem. Co. v. Wesolowski, 33 N.Y.2d 169, 171, 350 N.Y.S.2d 895, 305 N.E.2d 907 (1973). In a contract dispute a motion for summary judgment may be granted only where the agreement's language is unambiguous and conveys a definite meaning. See Seiden, 959 F.2d at 428; see also Rothenberg v. Lincoln Farm Camp, Inc., 755 F.2d 1017, 1019 (2d Cir.1985). If the language is susceptible to different reasonable interpretations, and "where there is relevant extrinsic evidence of the parties' actual intent," then the contract's meaning becomes an issue of fact precluding summary judgment. Seiden, 959 F.2d at 428; see also Hartford, 33 N.Y.2d at 172, 350 N.Y.S.2d 895, 305 N.E.2d 907.
 
 
 14
 Ascertaining whether or not a writing is ambiguous is a question of law for the trial court, W.W.W. Assocs., 77 N.Y.2d at 162, 565 N.Y.S.2d 440, 566 N.E.2d 639; see also Metropolitan Life Ins. Co. v. RJR Nabisco, Inc., 906 F.2d 884, 889 (2d Cir.1990), and we review the trial court's determination de novo. See Two Guys from Harrison-N.Y., Inc. v. S.F.R. Realty Assocs., 63 N.Y.2d 396, 403, 482 N.Y.S.2d 465, 472 N.E.2d 315 (1984); see also Garza v. Marine Transp. Lines Inc., 861 F.2d 23, 27 (2d Cir.1988). Contract language is ambiguous if it is " 'capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.' " Walk-In Medical Centers, Inc. v. Breuer Capital Corp., 818 F.2d 260, 263 (2d Cir.1987) (quoting Eskimo Pie Corp. v. Whitelawn Dairies, Inc., 284 F.Supp. 987, 994 (S.D.N.Y.1968)); accord, Care Travel, 944 F.2d at 988; Garza, 861 F.2d at 27. No ambiguity exists when contract language has "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." Breed v. Insurance Co. of North America, 46 N.Y.2d 351, 355, 413 N.Y.S.2d 352, 385 N.E.2d 1280 (1978); accord, Seiden, 959 F.2d at 428; Metropolitan Life, 906 F.2d at 889.
 
 
 15
 Although the parties dispute the meaning of specific contract clauses, our task is to determine whether such clauses are ambiguous when "read in the context of the entire agreement." W.W.W. Assocs., 77 N.Y.2d at 163, 565 N.Y.S.2d 440, 566 N.E.2d 639; see also Williams Press, Inc. v. New York, 37 N.Y.2d 434, 440, 373 N.Y.S.2d 72, 335 N.E.2d 299 (1975). By examining the entire contract, we safeguard against adopting an interpretation that would render any individual provision superfluous. See Two Guys, 63 N.Y.2d at 403, 482 N.Y.S.2d 465, 472 N.E.2d 315; see also Rothenberg, 755 F.2d at 1019; Muzak Corp. v. Hotel Taft Corp., 1 N.Y.2d 42, 46, 150 N.Y.S.2d 171, 133 N.E.2d 688 (1956). Parties to a contract may not create an ambiguity merely by urging conflicting interpretations of their agreement. See Seiden, 959 F.2d at 428; accord, Metropolitan Life, 906 F.2d at 889; Garza, 861 F.2d at 27. But, if ambiguity exists, then extrinsic evidence of the parties' intent may be looked to as an aid to construing the contractual language. See Curry Rd. Ltd. v. K Mart Corp., 893 F.2d 509, 511 (2d Cir.1990); accord, Care Travel, 944 F.2d at 988; Hudson-Port Ewen Assocs. v. Kuo, 78 N.Y.2d 944, 945, 573 N.Y.S.2d 637, 578 N.E.2d 435 (1991); O'Neil Supply Co. v. Petroleum Heat & Power Co., 280 N.Y. 50, 55-56, 19 N.E.2d 676 (1939).
 
 
 16
 With these principles in mind, we hold that the Rider to the Retirement Agreement is susceptible to more than one reasonable interpretation. Thus, it is ambiguous. Both parties offer interpretations with a sound basis in the language of the two instruments. The Rider language supports Rochester Tel's position because it does not explicitly mention the time period of either contract. The Plan itself further supports this interpretation because it states that consent from Rochester Tel's Board of Directors is required to suspend the three-year ban. The Board's consent was not sought prior to the execution of the Retirement Agreement or at any time before Sayers decided to accept a position with ACC Corp. Sayers' assertion that the company's interpretation would render the Rider meaningless is misconceived because the Rider at a minimum somewhat clarifies the meaning of "inimical activity" in the Plan.
 
 
 17
 On the other hand, appellant's construction of the contract's meaning finds strong support in the contract language. The Rider specifically states that Rochester Tel may not terminate Sayers' pension benefits "so long as Sayers does not ... violate the provisions of Section 2 of this [Retirement] Agreement," and § 2 expressly provides for only a two-year ban on competitive activity. Sayers contends that the term "inimical activity" in the Plan is broader than the Retirement Agreement's noncompete clause. According to this view, the Rider lifts the ban on competitive activity in the third year after Sayers' retirement, but it leaves intact the three-year ban on other kinds of inimical activity, such as business torts, defamation, or crimes directed at the company.
 
 
 18
 Looking beyond the contract language, Rochester Tel argues that appellant's position is undermined fatally by his asking the company for permission to take the ACC Corp. post. Rochester Tel believes this request constitutes an admission by Sayers that the Rider did not alter the Plan's three-year ban on inimical activity. We disagree. Appellant's equally plausible explanation of his behavior is inconsistent with such an admission. At the time he requested permission to take the ACC Corp. position--before this lawsuit began--Sayers informed the company that he requested approval simply to avoid conflict because he had "no desire to spend additional financial resources on legal haggling."
 
 
 19
 Therefore, we believe that the plain language of the Retirement Agreement and Plan, when considered together, lacks "a definite and precise meaning, unattended by a danger of misconception." Breed, 46 N.Y.2d at 355, 413 N.Y.S.2d 352, 385 N.E.2d 1280. Since the language is ambiguous, summary judgment was improperly granted.
 
 B. Parol Evidence
 
 20
 The district court additionally found that even were the contract ambiguous, summary judgment in favor of appellee was appropriate because Rochester Tel's parol evidence--an affidavit by corporate attorney Zamboni--supporting the company's interpretation was unrebutted. In our view the Zamboni affidavit is immaterial to any determination of the parties' intent. On the whole, the affidavit is argumentative and conclusory. In addition, it deals primarily with the intent of Rochester Tel rather than the joint intent of the parties.
 
 
 21
 More importantly, contrary evidence of the parties' intent was attached to the Zamboni affidavit. This evidence was in the form of a July 6, 1992 letter to Sayers from Robert F. Mechur, the attorney who negotiated the Retirement Agreement on Sayers' behalf. In relevant part, the letter stated:
 
 
 22
 It was your and our view that the provision in the [Plan], unless modified, might be construed so as to effectively extend the two year covenant not to compete contained in the [Retirement] Agreement to three years, if competition were found to be "inimical" to the best interests of [Rochester Tel]. It was also clear at the time, however, that it would have been unwise to seek the consent of the Board of Directors of [Rochester Tel] to a modification or waiver of the [Plan] provision. Therefore, we and [Rochester Tel] negotiated a provision which would have the same effect as a waiver, by acknowledging that competition which does not violate the non-competition provision of the [Retirement] Agreement also would not violate the [Plan].
 
 
 23
 Appellees' attempt to isolate from this letter one sentence--that concerning Board consent--mischaracterizes the entire document that plainly supports Sayers' position. In addition to this evidence, appellant submitted a sworn declaration in which he attested to his aim during contract negotiations. Sayers' intent, contrary to its description in the Zamboni affidavit, is also expressed in a June 20, 1992 letter that appellees attached to the Zamboni affidavit. Consequently, conflicting extrinsic evidence of the contracting parties' intent exists, creating a genuine issue of material fact barring the grant of summary judgment.
 
 C. Contract Authorization
 
 24
 In addition to their contentions regarding the proper interpretation of the Retirement Agreement Rider, the parties dispute its effect in light of the Plan's requirement that Rochester Tel's Board of Directors consent to employee ventures that otherwise would violate the three-year prohibition on inimical activity. Both Sayers and Rochester Tel insist that the Rider interpretation each advocates does not change the Plan but merely clarifies the meaning of "inimical activity" in that contract. Rochester Tel strenuously contends that the interpretation urged by appellant "produced an irreconcilable conflict with the [Plan]" and would amend the pension plan so that Board consent would be required. According to appellant, the Rider permissibly limited the period under which Rochester Tel could terminate his benefits for competing against Rochester Tel from three years to two years.
 
 
 25
 In any event, appellant contends that Rochester Tel ratified the Rider--and any attendant modification to the Plan's three-year ban--because for two years the Board failed to repudiate the Rider and instead received the benefit of Sayers' compliance. Rochester Tel responds that the Board had no reason to disclaim the Rider because Sayers complied with its terms as Rochester Tel has interpreted them and as Rochester Tel believed Sayers had interpreted them. Appellees further state that once Sayers violated the Plan's inimical activity clause, the company acted promptly to protect its position. Resolution of these contentions depends upon what the parties believed to be the effect of the Rider.
 
 
 26
 Sayers finally argues that the Retirement Agreement is an independently enforceable contract to pay benefits notwithstanding the Plan so long as Sayers did not violate the Retirement Agreement's terms. This argument relies on an interpretation in which the Rider not only does not amend the Plan, but also fails to incorporate its terms. We do not adopt this contention insofar as it avers the Retirement Agreement does not incorporate the Plan's benefit forfeiture provisions because such an interpretation is contrary to the language of the Retirement Agreement. In fact, the entire dispute before us concerns the conceded interaction between these two documents. Consequently, resolving the issue of whether the Retirement Agreement Rider was executed effectively only can occur after the Rider itself is interpreted by a finder of fact.
 
 CONCLUSION
 
 27
 The grant of summary judgment is reversed, and this case is remanded to the district court for further proceedings on the unresolved factual issues consistent with this opinion.
 
 
 
 *
 Hon. Miriam Goldman Cedarbaum, United States District Court Judge for the Southern District of New York, sitting by designation