MORSE/DIESEL, INC.,
Plaintiff–Appellee,

v.

TRINITY INDUSTRIES, INC.; Mosher Steel Company, and Aetna Insurance Company, Defendants–Appellants.

Nos. 1860, 1791, Dockets 95–7063, 95–7069.

United States Court of Appeals,
Second Circuit.

Argued June 19, 1995.

Decided Sept. 27, 1995.

436

Kenneth Conboy, New York City (Walter P. Loughlin, Mudge Rose Guthrie Alexander & Ferdon, New York City, Robert K. Cox, Daniel E. Cohen, Watt, Tieder & Hoffar, McLean, VA, of counsel) for Defendants–Appellants Trinity Industries, Inc. and Mosher Steel Company.

Anthony J. D'Auria, New York City (James J. Terry, Winston & Strawn, New York City, of counsel) for Defendant–Appellant Aetna Insurance Company (presently known as CIGNA Property and Casualty Insurance Company).

Peter N. Wang, New York City (Arthur S. Friedman, Charles R. Macedo, Friedman, Wang & Bleiberg, P.C., New York City, of counsel) for Plaintiff–Appellee.

Before: KEARSE, ALTIMARI and PARKER, Circuit Judges.

PARKER, Circuit Judge:

Major construction projects generate major construction litigation. Management of either is perilous.

Morse/Diesel, Inc., the general contractor for the construction of the Marriott Marquis Hotel in Manhattan's Times Square, sued the project's structural steel subcontractor, Mosher Steel Company, a division of Trinity Industries, Inc. (collectively "Trinity"), and Trinity's bonding company, Aetna Insurance Company, for damages arising from late performance on the subcontract. Trinity counterclaimed. After a lengthy jury trial in the United States District Court for the Southern District of New York (Loretta A. Preska, *Judge*), judgment was entered in favor of Morse/Diesel against Trinity and Aetna. Trinity and Aetna appeal.

This litigation has gone on for over ten years, and has surely cost millions of dollars in attorneys' fees and imposed innumerable demands on the district court. The jury trial alone lasted six and a half weeks. The work of the district judge in this case appears from our appellate distance to have been, in large part, exemplary. Nevertheless, we find that in one critical respect the jury was prevented from fairly evaluating Trinity's counterclaim. Because the error may have infected the jury's consideration of the case as a whole, we must reverse the judgment and remand for a new trial.

*Background to Trinity's Appeal*

The steel subcontract for the hotel project was executed in August 1982. It called for Trinity (and its sub-subcontractor, Helena Erectors, Inc., which erected the steel members fabricated by Trinity) to complete the erection work within 13 months, excluding inclement weather. In fact, the job took 20 months, from January 1983 to September 1984, and the final Helena crane was not

removed from the site until December 1984. Responsibility for that delay is the central question in this litigation.

Morse/Diesel blamed Trinity, and produced evidence of fabrication errors, shipping mishaps, crane failures, and so on. Morse/Diesel sought damages of over $37 million, consisting primarily of the costs of instituting an acceleration program designed to "recapture" the delay, as well as losses suffered by the hotel owner, the architect, and other subcontractors. The jury substantially agreed with Morse/Diesel and awarded the company almost $26 million in damages, to which the court added an additional $27 million in prejudgment interest.

Trinity blamed Morse/Diesel, attributing responsibility for much of the delay to the project's architect (John Portman & Associates) and structural engineer (Weidlinger Associates) (collectively "Architect") who made, in Trinity's estimation, unwarranted demands regarding the installation of certain special steel trusses, known as Vierendeel trusses, and the use of additional bracing during erection. Trinity also argued that inclement weather caused substantial delay. On appeal, Trinity contends that the district court unfairly limited its ability to present these two defenses.

Trinity also counterclaimed against Morse/Diesel for its own damages arising from additional work and delay in completing the subcontract, and appeals on the ground that the district court deprived it of a fair trial on the counterclaim. Further, Trinity claims the district court erred in refusing to allow Trinity's expert to challenge Morse/Diesel's evidence of damages. Finally, Trinity argues that the court miscalculated prejudgment interest.

We agree with Trinity that it was unfairly precluded from presenting its counterclaim to the jury. While it is not necessary to reach the other issues raised by Trinity's appeal, we nonetheless address those issues below in order to provide guidance for proceedings upon remand.

### Trinity's Right to Recover Damages

■ Trinity based its counterclaim for damages against Morse/Diesel on Schedule B, paragraph 53, of the subcontract, which provides:

> Should the Subcontractor be obstructed or delayed in the commencement, prosecution or completion of the work, without fault on his part, by action or inaction on the part of the Owner, Architect, Engineer or Contractor, or by changes in the work, the Subcontractor shall be entitled to include as cost the cost of labor, materials, equipment, supplies and other resultant costs occasioned by such delays and changes *notwithstanding any other provision contained in this agreement.*

(Emphasis added.)

By virtue of the "notwithstanding" clause, paragraph 53 overrides, in part, two "no-damages-for-delay" provisions of the subcontract. Article 16–G of the subcontract's General Conditions provides:

> Should the subcontractor be obstructed or delayed in the commencement, prosecution or completion of the work, without fault on his part, by the act, failure to act, direction, order, neglect, delay or default of the Owner, the Architect, the Contractor or any other contractor employed upon the work, or by changes in the work or by reason of fire, lightning, earthquake, enemy action, act of God or similar catastrophe, or by Government restrictions in respect to materials or labor, or by a strike or lockout beyond such subcontractor's reasonable control, *then he shall be entitled to an extension of time* for a period equivalent to the time lost by reason of any or all of the causes aforesaid but no claim for extension of time on account of delay shall be allowable unless a claim in writing therefor is presented to the Contractor with reasonable diligence but in any event not later than within four (4) days after the commencement of such claimed delay. The mere presentation of such claim shall not establish the validity of the cause of delay or of the extension of time for completion. *The subcontractor expressly agrees not to make, and hereby waives, any claim for damages,* including those resulting from increased supervision, labor or material costs, *on account of any delay,*

obstruction or hindrance for any cause whatsoever, including but not limited to the aforesaid causes, and agrees that the sole right and remedy therefor shall be an extension of time.

(Emphasis added.) And Article 3.4 of the subcontract provides in part:

All loss or damage arising from any of the Work through unforeseen or unusual obstructions, difficulties or delays which may be encountered in the prosecution of same or through the action of the elements shall be borne by the Subcontractor.

Trinity requested a jury instruction that it could recover damages under paragraph 53 for costs associated with delays caused by others. Judge Preska denied the request. Instead, she explained to the jury that Trinity's "claim for damages on account of delays allegedly caused by Morse/Diesel and its subcontractors" was an "area of ambiguity" in the subcontract. She noted Morse/Diesel's contention "that such damages are not recoverable" because of Article 16–G of the General Conditions and Article 3.4 of the subcontract (both quoted above), and read the pertinent provisions to the jury. Judge Preska then noted Trinity's contention that "these provisions of the subcontract have been negated by paragraph 53 of schedule B," and in turn quoted that paragraph to the jury.

Judge Preska then instructed the jury as follows:

Once again, it is your job to construe the subcontract in light of all the evidence, to ascertain what the parties intended with respect to [Trinity's] ability to assert claims for damages on account of delay. Whatever understanding you reach you must then apply in evaluating [Trinity's] delay claims.

The fatal flaw in these instructions is that the subcontract in fact contained no ambiguity as to Trinity's right to seek damages for delays caused by others. "Under New York law, a written contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed." *Cruden v. Bank of New York,* 957 F.2d 961, 976 (2d Cir.1992). "[T]he entire contract must be considered, and all parts of it reconciled, if possible, in order to avoid an inconsistency." *Id.* Whatever tension otherwise would exist among the three contract provisions discussed above is relieved by the "notwithstanding" clause of paragraph 53. By its unequivocal language, paragraph 53 trumps the otherwise inconsistent clauses of Article 3.4 and Article 16–G of the General Conditions. *See In re Gulf Oil/Cities Service Tender Offer Litigation,* 725 F.Supp. 712, 729–30 (S.D.N.Y.1989) (contract provision containing language "notwithstanding any other provision" explicitly overrides contrary provision). There is no ambiguity.

The precedence of paragraph 53 over contrary language in other provisions is not undermined, as Morse/Diesel contends, by Article 2.1 of the subcontract, which provides that, "in the event of any inconsistency between the terms and conditions" of the subcontract proper and the General Conditions, "the more restrictive provision, as applied to the Subcontractor, shall govern." Because there is no inconsistency once the "notwithstanding" clause is given its necessary effect, there is no reason to resort to the Article 2.1 tiebreaker.

■ The court thus erred in submitting the contract's meaning on this point to the jury. "Construing an unambiguous contract provision is a function of the court, rather than a jury...." *Cruden,* 957 F.2d at 976. The proper interpretation of the contract is a question of law for the court. *Harris Trust and Savings Bank v. John Hancock Mut. Life Ins. Co.,* 970 F.2d 1138, 1147–48 (2d Cir.1992), *aff'd,* — U.S. ——, 114 S.Ct. 517, 126 L.Ed.2d 524 (1993). The district court should have construed the contract according to its unambiguous terms, and clearly instructed the jury that Trinity had the right under paragraph 53 to recover any costs occasioned by delays in "the commencement, prosecution or completion of the work" that were not its own fault.

■ The error cannot be deemed harmless. We do not know what the jury would have done had it received a correct instruction on Trinity's counterclaim. The jury returned a general verdict. It certainly concluded that Trinity was at fault for *much* of

the delay and the resulting acceleration damages incurred by Morse/Diesel; the verdict makes that much clear. But Morse/Diesel did not recover all it sought. It is very possible the jury believed that Morse/Diesel (or the Architect or another contractor) was indeed to blame for some of the delay, but that the jury nonetheless did not award damages to Trinity on the counterclaim because it mistakenly concluded that Trinity was not entitled to damages under the "no-damages-for-delay" clauses. Properly instructed on the import of paragraph 53, the jury might also have awarded damages to Trinity for certain additional work, unrelated to delay. The mere fact, therefore, that the jury awarded substantial damages to Morse/Diesel does not necessarily mean that it would not also have awarded offsetting damages to Trinity had it been properly instructed on the significance of paragraph 53.

■ The question remains whether the error requires retrial of all claims or only the counterclaim. Where, as here, the claim and counterclaim concern essentially the same facts and issues, the question primarily being who is at fault for the delays, we believe it is impossible to isolate the counterclaim for retrial. Although it is apparent that the jury held Trinity accountable for much of the delay, we cannot determine *which* portions of the ten-month delay were laid at Trinity's feet. It is therefore impossible to identify the "remaining" portions of the delay for retrial solely on the counterclaim. Indeed, the jury might have determined that Trinity was only *partly* at fault for a particular period of delay, and that the Architect was also partly at fault for the same period of delay, but again did not offset the damages award to Morse/Diesel because of an erroneous interpretation of paragraph 53. Since we cannot know the answers to these questions, it is necessary to reverse the judgment in toto and remand both complaint and counterclaim for retrial.

*Remaining Issues in Trinity's Appeal*

1. *Extent of the Architect's Authority*

■ Trinity sought to defend against the claim of late performance, and to establish its counterclaim, by introducing evidence that its proposed methods for erecting the Vierendeel trusses and for temporarily bracing the structure were adequate, and that the Architect's directives to use alternative methods were unreasonable, unnecessary and the cause of substantial delay. Prior to trial, however, the district court granted a motion in limine, ruling that the Architect's decisions with respect to the erection of the trusses and the temporary bracing "must be accepted as final and valid under the contract, unless defendants can show such decisions to have been the product of bad faith, fraud, or palpable mistake equivalent to bad faith." *Morse/Diesel, Inc. v. Trinity Industries, Inc.*, No. 84–5791, slip op. at 3 (S.D.N.Y. April 8, 1994).

After reconsideration, the April 8 order was reaffirmed. No. 84–5791 (S.D.N.Y. May 12, 1994). In the second order, the court ruled that Trinity remained free to maintain that the Architect's "decisions to reject their proposed means and methods were taken in bad faith or were palpably mistaken so as to be equivalent to bad faith [but] unless defendants' evidence on this point rises to a level that would allow a reasonable jury to conclude that their claims of bad faith (or the like) were correct, they may not present the evidence at trial." Slip op. at 4.

The ruling was enforced during the trial, effectively curbing the testimony of Trinity's construction expert. In particular, the court curtailed testimony by the expert as to his opinion that there was no "engineering basis" for the Architect's refusal to permit Trinity to use its steel erection methods. The expert testified that the basis for this opinion was his determination that Helena's proposals were "totally adequate." In conformance with the pretrial ruling, the district court declared the opinion inadmissible: "It is insufficient to say that the engineer's rejection of the proposed drawings had no engineering basis. If the basis for that opinion, as I heard the witness state, was that [Helena's] proposal was adequate, that is insufficient." After further colloquy, Judge Preska reiterated her point: "That it would have worked, as we have said 500 times, is not sufficient to show that it was wrongfully rejected." Without more, the workability of Helena's propos-

als did not go to show that the Architect's rejection of them was "the product of bad faith, fraud, or palpable mistake equivalent to bad faith."

Trinity initially challenges the district court's interpretation of the subcontract provisions that allocate responsibility for the steel erection between Trinity and the Architect. Trinity contends that, read together, these provisions circumscribe the Architect's control over the methods of construction and therefore limit the Architect's authority to reject Trinity's plans. Like the district court, we believe Trinity's reading of the subcontract is one-sided.

Trinity emphasizes Article 3–A of the subcontract's General Conditions, which states:

> The Architect shall, on behalf of the Owner, periodically make on-site inspections of the work to check the quality and progress of the work and to monitor construction activities. Notwithstanding the foregoing, *the Architect will not be responsible for, and will not have control or charge of, construction means, methods, techniques, sequences or procedures or for safety precautions and programs in connection with the work* and he will not be responsible for any subcontractor's failure to carry out the work in accordance with the Contract Documents.

(Emphasis added.) Trinity also points to Article 3–B of the General Conditions:

> The Architect shall be the interpreter of the plans and specifications. In the event of dispute, the Architect shall side with none of Owner, the Contractor or the subcontractor, and the Architect shall also render a decision as to the items to be included within the scope of the work, *which decision is advisory only.*

(Emphasis added.)

But other broad provisions in the subcontract temper the subcontractor's independent authority, reposing approval authority in the Architect. Thus, Article 2.2 states in part:

> The Subcontractor shall undertake and complete the Work under the direction and supervision of the Contractor, *and to the entire satisfaction of the Contractor, the Owner and the Architect.*

(Emphasis added.) Further, § 1C–6(e) of the subcontract's Specifications, Vol. 1 provides:

> *The Architect will be the sole judge* of conformity. No materials shall be installed except in accordance with the plans and specifications or the Architect's written amendments thereto.

(Emphasis in original.) And Article 3–N of the General Conditions provides:

> The Architect, the Owner and the Contractor each will have the *authority to reject subcontractor's work* which does not conform to the Contract Documents.

(Emphasis added.)

Other provisions cover more specific ground. Paragraph 24 of Schedule B of the subcontract states in part:

> Subcontractor will furnish tower cranes for erection of structural steel, metal deck, precast plank, and hoisting of steel stairs. *All load calculations and support methods must be submitted for approval....* All reinforcing of the structure as required for the tower cranes is included by the Subcontractor. *Details and location of reinforcing must be submitted for approval.*

(Emphasis added.) Section 5B–1–05(b)(3) of the Specifications, Vol. 1 states:

> After award [of contract]: ... (3) Erection procedure (for review and scope): Submit data to illustrate the erection procedure, including the erection, bolting and welding sequence, temporary staying and bracing required, and clarifying information and calculations requested by the Architect/Engineer.

*See also* Schedule B, para. 29 ("Subcontractor will submit an erection sequence diagram, fabrication and erection Schedule for review."); Schedule B, para. 44 ("Subcontractor shall record the amount of camber that remains after the 1st Vierendeel truss has been erected and loaded with the precast Plank. Fabrication and erection adjustments are to be made for subsequent Vierendeel trusses, subject to the engineer's approval, to insure a level installation of the precast plank within the specified tolerances.")

In the May 12 Order, after considering several of the provisions just cited, Judge Preska wrote: "Read together, these provisions are most naturally understood to mean that while Helena may choose its means and methods, its choices are subject to the approval of the Architect/Engineer." Slip op. at 2. She concluded that "the Architect/Engineer had discretion to reject plans as inconsistent with the contract documents...." *Id.* at 3. We wholly agree with the district court's interpretation.

Our conclusion is not weakened by the "advisory only" language in Article 3–B of the General Conditions (quoted above), much cited by Trinity in its briefs. That language relates only to the Architect's decisions as to the scope of work in the event there is a dispute over the interpretation of the plans and specifications. That is not the issue here. Trinity does not contend that its proposed construction methods were in accordance with the plans but were disapproved nonetheless, a contention that might require an interpretation of the plans; rather, Trinity concedes that its proposed methods contravened the Architect's plans but avers that its methods should have been acceptable because they satisfied industry standards. The issue therefore is not the Architect's exercise of authority in interpreting plans, but its exercise of authority in disapproving Trinity's proposed methods of erecting the trusses and bracing. The subcontract delegates that authority to the Architect.

Whether Trinity's proposed methods for erecting the Vierendeel trusses and temporary bracing were sound and workable, and whether the Architect's demands were unnecessary, are ultimately irrelevant. It was therefore appropriate at trial to preclude Trinity's construction expert from stating his opinions on such questions.

■ To say the Architect has discretionary authority, of course, is not to say it has unbounded discretion. As noted above, the district court ruled that the Architect's decisions "must be accepted as final and valid under the contract, unless defendants can show such decisions to have been the product of bad faith, fraud, or palpable mistake equivalent to bad faith." This is an accurate statement of controlling New York law. The language derives directly from *Joseph Davis, Inc. v. Merritt–Chapman & Scott Corp.*, 27 A.D.2d 114, 276 N.Y.S.2d 479, 483 (4th Dep't 1967), *aff'd,* 23 N.Y.2d 872, 298 N.Y.S.2d 79, 245 N.E.2d 809 (1969). The same principle is restated in more recent decisions:

> It is established that the contractor cannot recover for additional work required by the architect or engineer in charge of construction where the contract gives the architect or engineer authority to determine the manner of performing the contract. In general, the parties are free to leave certain determinations to the judgment of the engineer and, where this has been done, the determination of the engineer is final as a matter of law, absent a showing of fraud or bad faith. However, if there appears no reasonable basis for the engineer's action, if it is patently erroneous, then the courts have found the equivalent of bad faith and the contractor is not bound by the engineer's decision.

*Savin Brothers, Inc. v. State of New York,* 62 A.D.2d 511, 405 N.Y.S.2d 516, 519 (4th Dep't 1978) (citations omitted), *aff'd,* 47 N.Y.2d 934, 419 N.Y.S.2d 969, 393 N.E.2d 1041 (1979); *see Thomas Crimmins Contracting Co. v. City of New York,* 138 A.D.2d 138, 530 N.Y.S.2d 779, 782 (1st Dep't 1988), *aff'd,* 74 N.Y.2d 166, 544 N.Y.S.2d 580, 542 N.E.2d 1097 (1989); *see also Brant Constr. Co. v. Metropolitan Water Reclamation Dist. of Greater Chicago,* 967 F.2d 244, 248 (7th Cir. 1992) (jury not appropriate arbiter where contract delegates task to engineer).

### 2. The "Inclement Weather" Clause

■ Trinity also defended against the charge of late performance by contending that much of the delay was attributable to inclement weather. The subcontract specifically excluded days of inclement weather from the 13–month period required for performance. Schedule B, para. 49; *see also* Art. 6 (time of the essence).

The parties are in substantial agreement that two to three months of the contract period was comprised of bad weather days on which erection work could not proceed. Trinity contends that, as a matter of law, it

should not be held accountable for the period of delay attributable to those days. The district court, however, ruled that the term "inclement weather" was ambiguous, and allowed Morse/Diesel to introduce parol evidence that the term referred only to unusually severe weather—that is, weather beyond what one would expect for New York at the time—and that the 13–month period was intended to *include* "standard" bad weather. The court charged the jury to decide which interpretation was intended by the contracting parties. Trinity argues this was error.

"Ascertaining whether or not a writing is ambiguous is a question of law for the trial court ..., and we review the trial court's determination *de novo*." *Sayers v. Rochester Telephone Corp. Supplemental Management Pension Plan*, 7 F.3d 1091, 1094 (2d Cir. 1993) (citing *W.W.W. Assocs. v. Giancontieri*, 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 566 N.E.2d 639 (1990)). Under New York law "[c]ontract language is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Id.* at 1095 (internal quotations omitted). Conversely, "[n]o ambiguity exists when contract language has a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." *Id.* (internal quotation omitted).

Reasonable people familiar with both this subcontract and the construction industry generally might well differ in their understanding of the term "inclement weather" as used in paragraph 49. Another provision of the subcontract itself casts doubt on Trinity's interpretation of the term; Article 3.4 provides in part: "All loss or damage arising from any of the Work through unforeseen or unusual obstructions, difficulties or delays ... or through the action of the elements shall be borne by the Subcontractor." Further, Morse/Diesel's evidence of industry usage of the term showed its meaning was not "definite and precise." There was no error in allowing the jury to determine the parties' intent based on extrinsic evidence.

### 3. *The Notice of Claim Requirement*

■ Morse/Diesel opposed Trinity's counterclaim at trial by contending that Trinity had not adhered to the subcontract's notice of claim requirements. *See* General Conditions, Art. 16–F ("If the subcontractor desires to make a claim for an increase in the Subcontract Price or any extension in the time for completion, he shall give the Contractor and Owner written notice thereof within ten (10) days after subcontractor's knowledge of the occurrence of the event giving rise to such claim, together with detailed labor and material costs."); General Conditions, Art. 16–G (four-day notice requirement for extension of time where subcontractor has been obstructed or delayed).[1]

In response, Trinity introduced evidence that it had provided timely written notice, as well as evidence intending to show that Morse/Diesel had actual knowledge of the damages and delays Trinity encountered and that Morse/Diesel had waived strict compliance with the notice of claim procedures by certain representations made to Trinity during construction. Specifically, a witness for Trinity testified that it was often difficult to submit notices of claims within the short periods required by the subcontract, and that he had explained this problem to a representative of Morse/Diesel, who told him "to do the best you can" and provide "a notification as soon as you can."

---

1. Paragraph 53 does not itself contain a notice of claim requirement, and Articles 16–F and G do not strictly pertain to claims for *damages*. It is therefore not obvious from the contract which (if any) notice requirement should be read into paragraph 53. The court gave jury instructions on both Articles 16–F and G, but its separate instruction relating to the "ambiguity" of Trinity's right to recover damages for delay under paragraph 53 does not refer to any notice requirement. Trinity, however, concedes it was subject to giving timely notice of its claims for damages, and does not object to the lack of clarity in the court's instructions on the point; its contention on appeal is only that the court ought to have charged the jury that the notice of claim requirement could be waived. Accordingly, that is the only issue we address.

Trinity submitted a proposed jury instruction that would permit the jury to find that Morse/Diesel had waived compliance with the notice requirement. The district court declined to give the instruction as requested. However, the court did give the following instruction: "Strict compliance with the written notice terms is not required if you find that there was substantial compliance under the subcontract's notice provisions." Trinity argues the instruction failed to present the waiver theory to the jury.

■ Although principles of waiver and estoppel generally may be invoked to bar enforcement of notice of claim requirements, *see Safway Steel Products v. Craft Architectural Metals Corp.*, 183 A.D.2d 452, 583 N.Y.S.2d 844, 845 (1st Dep't 1992), here the evidence was insufficient to warrant a waiver instruction. At best, the evidence showed that Morse/Diesel might permit substantial compliance with the notice requirement in instances when strict compliance would be very difficult. As the court gave an instruction allowing "substantial compliance," there was no error.

### 4. *Expert Testimony on Damages*

■ Trinity argues it was effectively precluded from challenging Morse/Diesel's evidence of damages by the limitations Judge Preska imposed on the testimony of Trinity's damages expert, a certified public accountant. The record reveals that the court prevented Trinity's expert from opining about the responsibility of various parties for bearing certain costs, for example, whether certain change orders were correctly attributed by Morse/Diesel's construction expert to the acceleration program rather than to unrelated design changes. The court ruled:

> In each and every one of the four examples given by Mr. Cox [Trinity's counsel] the proffered testimony is qualitative testimony relating to the reasonableness of including certain work within Mr. Webb's [Morse/Diesel's construction expert's] calculation. I find that this witness is not qualified by knowledge, skill, experience, training or education to render these sorts of qualitative opinions under *Daubert*.

■ The exclusion of expert testimony for failing to qualify under Rule 702 of the Federal Rules of Evidence lies within the district court's broad discretion and "will not be disturbed unless its ruling was manifestly erroneous." *McCullock v. H.B. Fuller Co.*, 981 F.2d 656, 657 (2d Cir.1992) (internal quotations omitted). The district court acted within its discretion in precluding Trinity's witness, an accountant, from rendering opinions on subjects outside his field of expertise. Questions relating to accounting methods, however, did fall within this witness's expertise, and the district court on remand may revisit her ruling as to such questions.

### 5. *Calculation of Prejudgment Interest*

The district court added almost $27 million in interest to the jury verdict of nearly $26 million. Trinity contends there were two errors in this calculation: first, the verdict already included a portion of the interest; second, the court applied the high contractual rate of interest to the "pass-through" claims which Morse/Diesel asserted against Trinity by virtue of its agreements with other parties.

### (a) *Double Counting*

■ One of the items of Morse/Diesel's alleged damages submitted to the jury was $7.3 million for "additional financing costs." This item was described by Morse/Diesel's expert as follows:

> [Earlier testimony concerned] the development of the actual financing rate of interest to be charged to the various charges in connection with the ... delay to the completion of the project. We then took that interest rate ... and applied it to the actual loans which were outstanding due to the increased time that these loans were required during construction. It's a commonly known term in the industry, interest during construction, IDC, and ... we calculated an additional financing cost of 7.3 million dollars.

To the extent Morse/Diesel paid interest on various loans which it would not have had to pay absent Trinity's late performance, there is no double counting. The award of prejudgment interest simply represents

Morse/Diesel's loss in not having those same funds available during the period between the date on which liability accrued and the date of judgment. Had Morse/Diesel not paid the "additional financing costs," it would have earned interest on the funds thereby retained. Prejudgment interest compensates for that loss. *See Bulk Oil (U.S.A.), Inc. v. Sun Oil Trading Co.,* 697 F.2d 481, 484–85 (2d Cir.1983).

Trinity asserts, however, that a small portion of the "additional financing costs" were paid *after* the date the cause of action accrued (September 1985, as found by the jury in accordance with New York law). Although prejudgment interest should generally be "assessed upon damages only as they become due," *Chandler v. Bombardier Capital, Inc.,* 44 F.3d 80, 84 (2d Cir.1994), where an undifferentiated verdict makes it "impossible to discern which of the costs formed the basis of the award," prejudgment interest may be calculated within the range of the court's discretion to "roughly and fairly" compensate the plaintiff. *United States v. Seaboard Surety Co.,* 817 F.2d 956, 966–67 (2d Cir.), *cert. denied,* 484 U.S. 855, 108 S.Ct. 161, 98 L.Ed.2d 115 (1987). There was no abuse of discretion in this case.

#### (b) *Pass–Through Claims*

Morse/Diesel entered into liquidation agreements with the hotel owner and certain other parties under which it asserted their claims for damages against Trinity in this single action. These claims, known as pass-through claims, represent a substantial portion of the verdict.

The steel subcontract provided for prejudgment interest in the event of breach at the rate of 3 percent over the prime rate as announced by Manufacturers Hanover Trust Co. Trinity objected to the use of the contract rate for the portion of the verdict representing the pass-through claims, arguing that the contract rate should apply solely to the portion reasonably representing Morse/Diesel's direct damages. Trinity posited that the New York statutory rate of 9 percent applied to the pass-through damages.

The district court applied the contract rate to the whole award, on the ground that New York law allows parties who have signed liquidation agreements to assert pass-through claims as if they were their own. *See American Standard, Inc. v. New York City Transit Authority,* 133 A.D.2d 595, 519 N.Y.S.2d 701, 702 (2d Dep't 1987). The judge also reasoned that Trinity suffered no prejudice from the ruling. Had Morse/Diesel simply paid damages to the other parties, it could have sought recovery for those payments in its breach of contract action against Trinity and recovered interest at the contract rate. There is no error.

#### Aetna's Appeal

Aetna appeals from the $31.8 million judgment entered against it, which represents the full amount of the performance bond it posted to cover Trinity's work. Because Aetna's liability as a surety depends on the liability of its principal, *see Granite Computer Leasing Corp. v. Travelers Indemnity Co.,* 894 F.2d 547, 551 (2d Cir.1990), our disposition of Trinity's appeal mandates that we also reverse the judgment against Aetna. Morse/Diesel's claim against Aetna, and Aetna's defenses thereto, may be considered anew in subsequent proceedings before the district court.

In addition to joining Trinity's claims on appeal, Aetna independently argues that the district court failed to instruct the jury that the scope of Aetna's liability under the performance bond did not extend to consequential damages, that the court improperly confused the jury by comparing a surety bond with insurance, and that Aetna's liability was contingent upon a declaration of Trinity's default, which Aetna contends Morse/Diesel never made. As these issues were never developed (nor even preserved) in the proceedings before the district court, we express no view on their merits.

#### Conclusion

For the reasons set forth above, the judgment of the district court is reversed and the case is remanded for further proceedings.